[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  18-14214

_____

D.C. Docket No. 1:18-cr-20272-UU-1

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

versus

DAVE ELYSEE,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 8, 2021)

Before NEWSOM, TJOFLAT, and GINSBURG,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

Defendant Dave Elysee appeals his conviction and sentence for possessing a firearm while a felon in violation of 18 U.S.C. § 922(g)(1). This appeal presents four issues: (1) whether the District Court abused its discretion in excluding out-of-court statements as hearsay when they were not offered to prove the truth of the matter asserted; (2) whether the District Court abused its discretion in admitting an unredacted copy of Elysee's prior firearm conviction; (3) whether the Florida offense of armed robbery is a violent felony under the Armed Career Criminal Act; (4) and whether Elysee's indictment was insufficient under *Rehaif*, and if so, whether the insufficiency affected his substantial rights.

The first issue (hearsay) turns out to be particularly muddled because of the piecemeal way it was presented at Elysee's trial. The issue was litigated in a series of *in limine* hearings throughout the trial, and although it raised a novel sub-issue—whether a defendant may introduce, as a defense to his prosecution, evidence that the police failed to conduct a reasonably diligent investigation into the charged crime—there was no briefing as to its legal foundation. Accordingly, our discussion focuses on the oft unclear back-and-forth between the District Court

---

[*] The Honorable Douglas H. Ginsburg, Circuit Judge for the United States Court of Appeals for the District of Columbia, sitting by designation.

2

and counsel. We take pains to interpret and expound the significance of these colloquies in a string of "Commentaries" interspersed throughout the opinion.

But first, we begin with the facts that gave rise to Elysee's § 922(g)(1) offense.

I.

A.[1]

Early in the morning of March 4, 2018, Dwayne Ireland and Chris Wilson, officers in the City of Homestead Police Department, were working undercover on an unrelated investigation on SW 4th Street in Homestead.[2] Ireland was stationed on the sidewalk on a bicycle. He was inconspicuous, wearing black shorts and a tan hoodie that only partially covered his lengthy dreadlocks. Wilson was sitting in an unmarked police car nearby, providing Ireland with coverage and security.

The officers saw two cars, a Kia Optima followed by a Ford Mustang, run a stop sign. The Optima came to an abrupt stop, and Defendant Elysee jumped out of the passenger side of the car and pointed a gun at the Mustang. Ireland recognized Elysee as someone he had previously arrested.[3] Elysee was dressed the

---

[1] The facts recited in this subpart come almost exclusively from the testimony Officers Ireland, Garcia, and Wilson of the City of Homestead Police Department.

[2] The City of Homestead is located within Miami-Dade County, Florida.

[3] Given the light cast from overhead streetlights, Ireland had no difficulty observing the man and his clothing.

same as when Ireland encountered him months ago—he had yellow sneakers, and both his shirt and pants were blue and yellow.

The Mustang sped off, and the Optima's driver, who was dressed in black, told Elysee to get back in the car. He got in, and the Optima sped away.

Officer Wilson, whom Officer Ireland had alerted by radio, followed the Optima and provided its license plate number to dispatch. Officer Raul Rodriguez, on patrol in a marked police car, received the information and headed toward Wilson's location. Upon arriving, Rodriguez pulled in front of Wilson's car and took the lead position behind the Optima. Officer Eric Reyes, who had been alerted by radio, appeared in his marked police car and fell in behind Rodriguez. Together, they pulled the Optima over. Rodriguez stopped his police car along the passenger side of the Optima, and Reyes positioned his car next to the driver's side. Reyes, on a loud speaker, ordered the driver to exit his car with his hands up. Moments later, the Optima sped off, causing Officers Rodriguez and Reyes to give chase. Sergeant Carlos Garcia, driving a marked police car, fell in behind them.

During the ensuing high-speed chase, the Optima turned into a warehouse. Knowing that there was only one exit on the other side of the warehouse, Garcia broke off from the other officers and waited to see if the Optima would come out of that exit. It did, and Garcia pursued it.

4

With Garcia in close pursuit and the other officers not far behind, the Optima hit a light pole, and its front seat airbags activated. While the Optima was slowly rolling to a stop, Garcia positioned his police car six feet from its passenger side. His car's "high beam[]" headlights, "LED spotlight," and "takedown lights" focused on the Optima's passenger side. The passenger door opened, and a man got out. He was "holding a black firearm with both hands" and "look[ed] back at" Garcia. Garcia noticed that he was wearing "a yellow and blue . . . sport type top." Officer Wilson, who had arrived at the scene moments after the Optima crashed, was about twenty feet from the car's passenger door when the man got out of the car.[4] He observed that he was "wearing a . . . blue and yellow shirt, yellow shoes."

After the man looked back at Garcia, he dropped the firearm and started running toward the front of the Optima then away from the driver's side of the car. Wilson pursued the man but lost sight of him. He searched the area and ultimately found the man in the fetal position on the floorboard of a parked car. Wilson placed him under arrest and returned to the scene of the crash. Meanwhile, Officer Rodriguez found a 9mm handgun, which was equipped with a loaded 18-round magazine, near the right front tire of the Optima. Officer Ireland arrived moments

---

[4] While Wilson had not been involved directly in the pursuit of the Optima, he had listened to the radio updates from Reyes, Rodriguez, and Garcia and followed the general direction of the pursuit. He was close by when the Optima struck the light pole.

5

later and identified the man as Elysee, the man who pointed the gun at the Mustang on SW 4th Street.

## B.

The week after Elysee was arrested,[5] Darius Deen, the other occupant of the Optima, appeared at the Homestead Police Station and told Detective Raul Cabrera that he, not Elysee, was the Optima's passenger and that the firearm found at the scene was his. At the time, Cabrera was a member of the Task Force that the United States Bureau of Alcohol, Tobacco, Firearms and Explosives had formed with officers of the Homestead Police Department ("ATF Task Force").

Soon after Elysee's arrest, the ATF Task Force assumed the investigation of the case, and on April 6, 2018, a Southern District of Florida grand jury indicted Elysee for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He entered a plea of not guilty and stood trial. A jury found him guilty as charged.

---

[5] Elysee was arrested and taken into custody on March 4, 2018, for committing two state law offenses: felon in possession of a firearm and resisting an officer without violence. At the time of his arrest, Elyseee was serving a two-year term of probation after he pled guilty to armed robberies with a firearm committed on September 18, 2013; September 27, 2013; and November 10, 2013. On March 6, 2018, a petition to adjudicate Elysee guilty of violating the conditions of his probation was filed in the Circuit Court. He was indicted for the 18 U.S.C. § 922(g)(1) offense while being detained by the Circuit Court on the state charges and for violating the terms of his probation.

Elysee's Presentence Investigation Report ("PSI") identified him as an armed career criminal under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), because he had one prior Florida conviction for aggravated assault with a deadly weapon and three prior Florida armed robbery convictions. At sentencing, Elysee argued that his PSI incorrectly identified him as an armed career criminal under the ACCA because his prior convictions did not qualify as violent felonies. The District Court disagreed and sentenced him to 235 months' imprisonment.[6]

## C.

Elysee now appeals his conviction and sentence, arguing that his conviction should be reversed for three reasons. First, the District Court abused its discretion in precluding him from questioning Detective Cabrera about the substance of Deen's confession to show its "effect on the listener." Second, the District Court abused its discretion in admitting into evidence, under Federal Rule of Evidence 404(b), the document establishing Elysee's prior conviction for armed robbery without redacting the document's references to "armed robbery" and "deadly weapon." Third, the indictment was insufficient to charge a 18 U.S.C. § 922(g) offense under the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct.

---

[6] The applicable Sentencing Guidelines prescribed a sentence range of 188 to 235 months' imprisonment.

7

2191 (2019), which was decided after Elysee's conviction. We consider the merits of these arguments in parts II, III and IV that follow.

Elysee also argues that his sentence should be vacated on one ground: the District Court erred in ruling that a prior conviction for armed robbery under Florida law qualifies as a "violent felony" under the ACCA. We consider the merits of that argument in part V.

## II.

Darius Deen appeared at the Homestead Police Station a week after Elysee's arrest and told Detective Cabrera that he, not Elysee, was the passenger of the Optima at the time of the crash and owned the handgun found at the scene. Elysee argues that the District Court abused its discretion in invoking the hearsay rule[7] to preclude his counsel from questioning Detective Cabrera about the substance of Deen's confession to show its "effect on the listener." The effect, he argues, was that neither Cabrera nor any other officer involved in the investigation did any additional digging to determine whether Deen's confession was truthful. According to Elysee, this shows that the police failed to act as reasonably diligent officers under the circumstances because their minds were made up that Elysee was the culprit.

---

[7] Fed. R. Evid. 802.

8

Elysee's argument is based on two largely unexamined assumptions that are not clearly supported by the record. First, that the District Court actually precluded Elysee from eliciting the testimony to show its "effect on the listener." And second, that if the District Court did so, it was on hearsay grounds. In subpart A, we provide the context for Elysee's argument and explain why these assumptions are, at the very least, highly uncertain. In doing so, we conduct a painstaking examination of the trial transcript and provide intermittent commentary to explain our interpretation of what unfolds.

In subpart B, we address and ultimately reject Elysee's argument that the testimony was admissible for its effect on Cabrera and the other Task Force officers.

A.

The dispute over Cabrera's testimony about the Deen confession stems from defense counsel's opening statement to the jury.[8] In their opening statement, defense counsel represented that Elysee was not the passenger of the Optima when

---

[8] At his trial, Elysee was represented by Assistant Federal Public Defenders Ian McDonald and Arun Ravindran, and the Government was represented by Assistant U.S. Attorneys Jonathan D. Stratton and Brian J. Shack. All participated in the trial. For convenience, in reporting on their participation, we refer to Elysee's attorneys in the plural as "defense counsel" or the "the defense" and the Assistant U.S. Attorneys in the singular as "the prosecutor." On appeal, the parties are represented by different attorneys. Elysee is represented by Federal Public Defender Michael Caruso and Assistant Public Defender Andew L. Adler. The Government is represented by the U.S. Attorney, Ariana Fajardo Orshan, Chief of the Appellate Division, Emily M. Smachetti, and Assistant U.S. Attorneys Nicole Mariani and Jason A. Reding.

9

it crashed and did not have a gun.  The police arrested the wrong man: Deen was

the culprit, not Elysee, and the police knew it.  How?  Because following Elysee's

arrest, Deen appeared at the Homestead Police Station and told the officer on duty

that he, not Elysee, was the passenger in the Optima and the one with the gun.

> Counsel began by explaining why the police arrested Elysee.

> There were two guys in a white Kia.  There was a chase.  It did go through a large part of Homestead and Florida City.  There was a bailout.  Okay.  During that bailout, two guys exit that car.  One of them runs and is never caught. One of them is my client, Dave Elysee.  What happens when they catch Dave is they cuff him.  After they have Dave in cuffs, they go back to the crash scene where other officers were at the crash scene and they find a gun.  And from then and from there on, it's just simple.  We got a guy in cuffs and we've got a gun.  We'll just put the two together and call it a case.

> Defense counsel then described Deen's appearance at the police station.

> [The other guy's ] got a name.  It's Darius.  And how do we know that? Because guess where he went a couple of days later, a few days later after of his bailout? . . . .  The man literally went into the Homestead Police Department and said , hey, guys, I'm here to admit something that happened. They said, okay, what have you got to say?  He basically said this: That night Dave picked me up and it was my gun; and when we jumped out of the car, I threw the gun; and you all didn't catch me, but I'm here to tell you that's what happened.  So you've got a man literally coming into the Homestead Police Department, okay, and he's saying you got the wrong guy.  *And you are going to hear exactly what the officers at Homestead did with that information.*

(emphasis added).

*          *          *

*Commentary 1*

10

Defense counsel's strategy in their opening statement was to put the Government on the defensive. By telling the jurors that "you are going to hear exactly what the officers at Homestead did with th[e] information" Deen provided to Cabrera,[9] the defense put the burden on the Government to present the officer's testimony and explain why, in the face of Deen's full-blown confession, the Government proceeded against Elysee and not Deen.[10]

*          *          *

---

[9] When defense counsel told the jurors about Darius Deen's appearance at the police station and that they would hear about it from the police officers, they took a huge gamble. If, as it came to pass, the officers did not testify about Deen's appearance, defense counsel invited the prosecutor to remind the jury in his closing argument of what defense counsel had "promised" in their opening statement, and would ask rhetorically, "Where is the evidence that Deen was the passenger and the one with the gun?"

"Under a doctrine variously known as that of 'fair reply,' 'opening the door,' 'invited error,' or 'retaliation,' otherwise impermissible prosecutorial comments during closing argument are legitimized on the basis that the subject matter of the remarks has already been interjected into the proceedings by the defense." Arkin, 3 Business Crime ¶ 12.05 (2020). The reason defense counsel did not attempt to avoid the gamble they took by moving the District Court for a hearing *in limine* to obtain a ruling on the Government's anticipated objections to Detective Cabrera's testimony may have been that they expected Deen to testify. He was, after all, on the witness list they filed the day before the trial.

[10] Prior to the parties' opening statements, the District Court gave the jury some preliminary instructions. Included in the instructions were these: "In their opening statements and closing arguments the lawyers will discuss the case, but their remarks are not evidence." "[T]he Government must prove the defendant's guilt beyond a reasonable doubt." "[T]he burden of proof is on the Government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify." In light of these instructions, the jurors would surely expect the Government, not the defendant, to call the officers as witnesses.

After defense counsel concluded the opening statement, the Government proceeded with its case in chief. Sergeant Garcia testified first. Officer Rodriguez followed.[11] After their testimony, the Court adjourned for the day.

The next day, before the jury entered the courtroom and the trial resumed, defense counsel informed the District Court that they intended to call Cabrera as a defense witness.[12] As the lead ATF Task Force officer, he was seated at the counsel table next to the prosecutor.[13] He would be testifying for the Government later in the day.

Defense counsel's plan was to recall Cabrera in Elysee's case in chief and get him to testify that he did virtually nothing to determine whether what Deen told him was true—that he was the Optima's passenger and that the gun found at the scene of the crash was his. The adequacy of the police response to Deen's confession would be on trial.

However, for Cabrera to reveal what Deen told him when he came to the police station, defense counsel would have to overcome the Government's hearsay

---

[11] Rodriguez was a detective in the Homestead Police Department and, like Detective Cabrera, was a member of the ATF Task Force working the case. Rodriguez arrived at the scene of the crash after the occupants of the Optima had fled. Thus, his testimony did not involve identifying Elysee as the passenger of the vehicle.

[12] Cabrera was the Government's last witness that day. He testified that he was a detective in the Homestead Police Department and a member of the ATF Task Force.

[13] At a hearing held on May 7, 2018, to determine whether Elysee should be detained pending trial, Cabrera testified that he was the "lead" officer in the case.

objection. They apparently thought they would be able to do so if the Court

allowed them to proffer Cabrera's testimony (in the absence of the jury) during the

Government's case in chief.[14] They explained why Cabrera's revelation of what

Deen said should be admissible:

> [DEFENSE COUNSEL]: . . .

---

[14] In effect, defense counsel was requesting the District Court to hold a hearing *in limine* to consider the Government's anticipated hearsay objection to Detective Cabrera's testimony about the Deen's appearance at the police station. The Court granted their request and conducted the hearing piecemeal in the absence of the jury as the Government's case in chief proceeded.

We note in passing that the words *in limine* do not appear in Elysee's opening or reply briefs or in the Government's answer brief. The record indicates that defense counsel and the prosecutor were aware of the nature of a hearing *in limine* pre-trial. But the record contains no indication as to why defense counsel waited until the second day of trial to seek a ruling on the objections to Cabrera's testimony that would be available to the prosecutor not only under Fed. R. Evid. 801(c) (hearsay), but also under Fed. R. Evid. 403 (excluding relevant evidence for prejudice, etc.). The record also contains no indication that defense counsel and the prosecutor were conscious of the fact that evidentiary rulings made during a hearing *in limine* are provisional and that, under Fed. R. Civ. P. 103(b), an evidentiary ruling is not preserved for appellate review unless the court "rules definitively on the record."

As indicated *infra,* the Government lodged a hearsay objection to defense counsel's use of Deen's confession to prove the identity of the Optima's passenger. Defense counsel responded to the hearsay objection obliquely rather than head on. They contended that Deen's statements to Cabrera were admissible for two non-hearsay purposes: to impeach officer credibility and to show the statements' effect on the listener. Before the Court could consider these non-hearsay bases for admissibility, the prosecutor informed the Court that he intended to introduce into evidence the recording of a lengthy telephone call Elysee made from the Miami-Dade County TAK jail on March 8, 2018, four days after his arrest. From there, the scope of the hearing expanded exponentially. The court-counsel discussion thereafter focused first on the admissibility of the entire recording, and then on the admissibility of a part of the recording.

As we point out *infra,* the prosecutor did all of this in an effort to prove that Cabrera's (the police's) response to Deen's confession complied with the "reasonable officer" standard of performance involved in defense counsel's "effect on the listener" defense. The prosecutor finally abandoned his effort and the Court and the parties returned to the question that triggered the hearing *in limine*: whether Cabrera could reveal what Deen told him so that he could explain the investigative action he took in response. The Court told defense counsel that it would not rule on the admissibility of Detective Cabrera's testimony for that purpose unless they called Cabrera to the witness stand (in the absence of the jury) and examined him under oath about his encounter with Darius Deen at the police station.

My intention with [Detective Cabrera] is to recall him in my case in chief to get into a statement by this individual named Darius Deen, who you heard about in opening from the defense.

Basically, the substance is Darius Deen a couple of weeks later comes into the police station and is interviewed by [Cabrera] and essentially makes an admission that the gun in the car is his and that he's the passenger.

Now, my understanding from the Government is that they would seek to exclude all that on hearsay grounds. But the reason I wanted to front that to the Court is because, since the man is going to be up there testifying, it seems like it would be most efficient if I could get into that while he was there.

THE COURT: . . . And the exception to the hearsay rule would be what?

[DEFENSE COUNSEL]: Number one, Your Honor, *it's not hearsay. It goes to the effect on the listener*. I think it will be established in testimony that [Detective Cabrera] conducted many of the postarrest investigative steps in this case, and essentially what you have is *materially exculpating information* which *a reasonable officer* would have relied upon.

Based on the defense theory of the idea that my client did not have the gun, I think that's *probative of* two issues: Number one, *who actually had the gun*; but then also as fundamental and important, *officer credibility*, which is clearly the centerpiece of the evidence at this point.

(emphasis added).

The Government responded:

[PROSECUTOR]: Judge, the officers didn't believe him. They caught him in several lies. There was no effect on the listener. We have jail calls where the defendant was planning to have someone come in and lie about this false exculpatory. So there is no effect on the listener. This is hearsay which we know is false.

14

The Court declared, "I think it's offered for the truth.  So I'm not going to allow it."  And with that, the trial resumed.

*          *          *

*Commentary 2*

In their speaking proffer, defense counsel advanced three theories for eliciting from Cabrera the statements Deen made at the Homestead Police Station and the investigative action Cabrera took in response.[15]  According to defense counsel, Deen's statements would be relevant (1) to prove who had the gun, (2) to challenge the credibility of officers involved in the investigation of the case, and (3) to show the statements' effect on the listener, namely Cabrera—that he failed to respond to the statements as a reasonable officer would have under the circumstances.[16]

---

[15] We refer to these theories in shorthand respectively for the convenience of discussion: "First Theory," "Second Theory," and "Third Theory."

[16] Federal Rule of Evidence 401's test for relevant evidence states that

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.

The District Court never made the inquiry of defense counsel.  The prosecutor never mentioned relevance and thus agreed to the response's relevance.  Likewise, in the parties' briefs on appeal, the words "relevant" or "relevance" do not appear in the discussion of Cabrera's performance.

Under the First Theory, Deen's statements would be relevant as "probative" of "who actually had the gun"—Deen, not Elysee. The prosecutor said the statements would amount to hearsay.[17] And the District Court agreed. If "offered for the truth," what Deen told Cabrera would be hearsay and thus inadmissible[18] unless an exception to the hearsay rule applied.[19] The Court asked defense counsel whether any of the exceptions applied, and they cited none.[20]

Under the Second Theory, Deen's statements would be relevant in judging "officer credibility"—specifically, in cross-examining an officer about his investigative response to Deen's appearance at the Homestead Police Station and the exculpatory information he provided. Five officers testified in the Government's case in chief: Officers Garcia, Rodriguez, Wilson, Ireland, and Cabrera.[21] None other than Cabrera had participated in the investigation of the case following Elysee's arrest. Defense counsel cross-examined Officers Garcia, Wilson, and Ireland about their identification of Elysee as the Optima's passenger

---

[17] *See* Fed. R. Evid. 801(c).

[18] *See* Fed. R. Evid. 802.

[19] *See* Fed. R. Evid. 803, 804.

[20] At no point during the trial did defense counsel seek to introduce what Deen said to Cabrera as a statement Deen made against his penal interest. *See* Fed. R. Evid. 804(b)(3). Indeed, the record contains nothing to indicate that Deen's statements revealed a criminal offense under Florida law.

[21] Cabrera followed the fingerprint examiner, who found no identifiable fingerprints on the firearm found at the crash scene.

16

with a firearm and never mentioned Deen or Cabrera.[22]  Defense counsel made no attempt to cross-examine Cabrera because his direct examination was very limited in scope.  The prosecutor merely had him explain the meaning of "hammer," a word Elysee uttered during a segment of the March 8 phone call he made from the jail.  Given the limited scope of the direct examination, defense counsel, on cross-examination, could not have asked Cabrera about his encounter with Deen and what he did afterwards.

Under the Third Theory, Deen's statements would be relevant to show their "effect on the listener,"[23] *i.e.*, Cabrera.  The statements—or so the argument goes—would have prompted a "reasonable officer," having received the "materially exculpating information" Deen provided, to launch an investigation to determine whether the information was plausible.[24]  But Cabrera did nothing

---

[22] Officer Rodriguez arrived on the scene after the crash and searched the Optima. Defense counsel did not refer to Deen or Cabrera in cross-examining Rodriguez.

[23] We assume that the words "effect on the listener" refer to the listener's behavior in the form of conduct, words, or acts and that the effect would be relevant because it would tend to prove a fact at issue in the case.  During the hearing *in limine,* defense counsel referred to only one listener, Cabrera.

[24] The Third Theory differed markedly from the Second Theory; if not, then the Third Theory would have been mere surplusage.  The Second Theory focused on officer credibility. As we explain in part II.B.1, our precedent approves of the use of out-of-court statements as relevant to the credibility of an officer's explanation of his investigative work in a case.  The Third Theory focused on what a reasonable officer would have done after listening to what Deen had to say (to Cabrera).

because the police already had their man in custody.[25]  And the jury needed to know that.

Was Cabrera's failure to perform as a reasonable officer relevant to an issue in the case, specifically, an issue the jury would have to resolve in determining whether to convict Elysee of violating 18 U.S.C. § 922(g)(1)?  Defense counsel were never asked whether Cabrera's performance was relevant or whether the jurors should consider it in deliberating over their verdict.  If they had been asked, their answer, of course, would have been "yes."[26]  If asked to explain that answer, they might have said something like this: By virtue of the oath of office he took when he joined the Homestead Police Department, Cabrera promised to support and defend the federal and state constitutions and to "well and faithfully perform the duties of" a police officer.[27]  This meant that he was obligated to carry out his duties in conformance with the reasonable officer standard of performance.

---

[25] Both the District Court and the prosecutor saw Cabrera's inadequate performance as the heart of Elysee's defense in the case.  *See infra* Commentary 3 and preceding text.

[26] Defense counsel were never asked during the hearing *in limine* to identify the issue Cabrera's allegedly substandard conduct would tend to prove so as to render the conduct relevant.  Elysee's brief is silent on the point.  So is the Government's.

[27] When he was sworn in as an officer of the Homestead Police Department, Cabrera took this oath:

> I do solemnly swear (or affirm) that I will support, protect, and defend the Constitution and Government of the United States and of the State of Florida; that I am duly qualified to hold office under the Constitution of the state; and that I will well and faithfully perform the duties of (title of office) on which I am now about to enter. So help me God.

> Florida Const. art. 2, § 5. Public officers.

Cabrera owed this obligation to the people of Florida. Thus, when Deen confessed, Cabrera was duty-bound to the public to take steps to determine whether Deen's story was plausible. If he failed to do that, what then? Could Elysee assert Cabrera's failure—the breach of his obligation to the public and therefore to Elysee qua member of the public—as a defense, in itself, against the charge for which he was standing trial?[28] Once again, defense counsel would presumably say, "yes." But what about the public? If Elysee were acquitted on account of Cabrera's breach, the public would suffer for the breach. But, as defense counsel saw it, that's the way it should be. Deen's confession and Cabrera's dereliction of duty were "at the heart" of their defense.[29]

In essence, defense counsel were presenting Cabrera's failure to satisfy the reasonable officer standard as a matter of right, like the affirmative defenses authorized by the Federal Rules of Criminal Procedure: alibi,[30] insanity,[31] and public authority.[32] Therefore, after considering the evidence the parties

---

[28] If so, every accused standing trial for a criminal offense has a right to have the jury consider the adequacy of the law enforcement investigation that led to his indictment.

[29] Appellant's Br. at 38. "By prohibiting Mr. Elysee from eliciting that confession and its effect on the investigation, the court precluded him from delivering on that compelling argument at the heart of his *defense*," *id.* (emphasis added), "the officers' fail[ure] to properly investigate [Deen]," *id.* at 37.

[30] *See* Fed. R. Crim. P. 12.1 Notice of Alibi Defense

[31] *See* Fed. R. Crim. P. 12.2 Notice of Insanity Defense

[32] *See* Fed. R. Crim. P. 12.3 Notice of Public-Authority Defense

19

presented—Cabrera's testimony and the testimony of others relevant to Deen's credibility and Cabrera's performance—the Court would determine whether the evidence was sufficient to submit the defense to the jury. If it was, in its charge to the jury following the parties' closing arguments the Court would instruct the jury on the elements of the defense and the weight the jury should accord its ultimate finding on the defense in deliberating its verdict. The litigation of Cabrera's performance under the reasonable officer standard would, in effect, constitute a subsidiary trial—a trial within a trial.

*          *          *

Officer Wilson testified next for the Government. At the conclusion of his testimony, the Court excused the jury,[33] and the hearing *in limine* continued. Its focus, however, changed dramatically.

Proceeding as if the Court would allow the defense to introduce Deen's confession in its case for the non-hearsay purpose of showing its "effect on the listener," the prosecutor sought a ruling *in limine* on the admissibility of the Government's evidence explaining the police's failure to pursue Deen as a suspect. That evidence would come in the form of the recording of a telephone call Elysee

---

[33] The witness the prosecutor planned to present following Wilson's testimony was late, so the District Court continued the discussion on the admissibility of Deen's confession for a non-hearsay purpose while waiting for the witness to arrive.

20

made from jail on March 8, four days after his arrest.[34]  The prosecutor had obtained the recording and, "last evening,"[35] had transcribed it.[36]  He promptly provided the Court and defense counsel copies of the transcript.

The recording, and thus the transcript, contained six substantive "segments." *See* Attachment 1.  The transcript depicted each segment with a time frame indicating when that segment of the call began and ended.  The prosecutor had highlighted portions of the six segments, which he deemed "relevant," incriminating "admissions . . . by the defendant."

The Court asked the prosecutor whether he intended to play the entire recording or just the portions "highlighted" in the transcript.  He expressed a willingness to play "whichever [the Court] would prefer to hear."  The Court then told him to play the entire recording.

---

[34] Elysee made the phone call while in state custody in the Miami-Dade County TAK Jail.  *See supra* note 5.  While the record is silent on the point, we assume that, following his indictment in this case, he was moved to the federal Metropolitan Correctional Center and detained pending trial.

[35] A few days earlier, the prosecutor informed defense counsel of the recording.  He thereafter provided the defense with a copy of the entire recording.  As indicated in the text *infra,* part of the recording, Segment 16:08 – 19:00, was received in evidence as Government Exhibit 12 and played for the jury.  A transcript of Segment 16:08 – 18:00 was marked for identification, as Government Exhibit 12-A, and given to the jury to aid the jurors in understanding what was said in that segment as played.

[36] The transcript of the entire jail call was not included in the record on appeal.  The parties produced the transcript pursuant to this Court's August 7, 2020 Order.  The transcript is included as Attachment 1 to this opinion.  A transcription of Segment 16:08 – 19:00, which was played to the jury, is contained in Attachment 1 at 5–6.

The prosecutor started with the first segment, Segment 8:00 – 13:24.  In it, he said, Elysee "talk[ed] about coaching [someone] to come take claim of the gun."

> [Dave Elysee]: . . . "and the new information I got to tell you is . . . that I wanna know if . . . ok, I got . . . basically you know . . . I don't wanna talk like that, but basically in other words"
>
> [Recipient]: Yeah, I know what you saying bruh I know what you saying yeah
>
> [Dave Elysee]: Ya feel me? Da da da da da . . . if you do that . . . if that's what you telling me is accurate . . . and then I was like "ok, but what about my about my [unintelligible] I wanna be able to get him out, I don't want him sitting in there, ya feel me?  I want him out so he could be able to do what he got to do from the outside.  We ain't trying to both of us . . . no . . . I need him out.  I need you to guarantee me that he can get out."  He was like "so long as he got no charges no none of that, you already know its out, they gonna give him a bond."  I say "and he will be out the same day," he said "the same day,"  I said "ok, listen sir, I'm giving you this information because you're my lawyer, this is between us two confidential, client confidential, and this our record, I don't want this coming back up to nothing like, ya feel me?  You my lawyer, you represent . . ."
>
>                . . . .
>
> [Dave Elysee]: . . . "I don't want to even know names, I don't want to know nothing, when you for sure its what you wanna do . . ."  He said "with [unintelligible], you're not going to need a lawyer from what you telling me" so he say from what I'm telling him, I won't even need a lawyer for the uhh the probation shit.[37]  So basically, the that lawyer I get, I'll throw it on you, ya feel me?  With um, while you out on bond or whatever, ya feel me?  But I told him "I still we aint still ain't come to a conclusion with that, [unintelligible] you know I aint really trying to holla at his ass too long on the phone…"

---

[37] According to the PSI, at the time Elysee committed the instant offense, he was on probation pursuant to sentences imposed by the Miami-Dade County Circuit Court in case numbers F13-028411, F13-028442, and F13-028447.  *See supra* note 5.

22

*See* Attachment 1 at 3–4.[38]

After playing Segment 8:00 – 13:24, the prosecutor interpreted what Elysee

and the recipient were saying:

> [Elysee] is talking to a friend about a conversation he had with a lawyer, . . . There would be an agent to say that I told the lawyer that kind of a story, as in street slang.
>
> The [first] highlighted part is when [Elysee]'s saying: "The new information I have to tell you, that I want to know - - okay, basically you know, I don't want to talk like that."
>
> But basically he's saying he doesn't want to talk about the exact details of *this plan or scheme to have someone else come with the gun.* And the next sentence says, "Yeah, I know what you're saying, bro, I know what you're saying."
>
> [Elysee] says, "You're feeling dah, dah, dah, dah, dah, and if you do that," which is the lawyer talking to him, "if you do that, if you do tell that story, you do come up with that story, if that's what you're telling me is accurate," and then they go on to talk about he's going to get out.
>
> But then at the end, at the [second] highlighted portion, [Elysee] wants to talk about, well, if my friend comes in and does this, *I want him to get out on bond. I want him to get out immediately that same day and I want you to guarantee me that.*
>
> And he says that the lawyer responds to him that I don't want to know no names. I don't want to be told anything else.
>
> And then [in] the [third highlighted] portion of the segment, [Elysee] says: You're not gonna need a lawyer, from what you're telling me. And he says, "So basically, the lawyer that I get, I'll just throw it on you," talking to

---

[38] The above excerpt consists of the highlighted portions of the Segment 8:00 – 13:24. The non-highlighted portions of the transcript provide context to what is being said and are detailed in Attachment 1. The District Court heard both the highlighted and non-highlighted portions of Segment 8:00 – 13:24. *See* Attachment 1 at 3–4.

his friend saying if you go in and claim it, I'll give you my lawyer once I get out.

*And that would be the importance of that, when, again, [defense counsel] opened yesterday saying that [Deen] claimed ownership of the gun and that Homestead Police Department did nothing to further investigate that. And [coaching Deen to come take claim of the gun] is completely relevant to that issue. . . .*

THE COURT: Well, it's also going to be completely relevant to what [defense counsel] said earlier also and proffered as testimony.

[PROSECUTOR]: Absolutely.

THE COURT: So we're going to have this whole discussion about . . . Darius [Deen] coming into the police station and --

[PROSECUTOR]: *If the defense wants to call [Deen], they have every opportunity to subpoena him and call him.*[39]

We do have significant concerns about that, Your Honor, if you'd like me to raise those now.

---

[39] Defense counsel listed Deen as a witness in the witness lists they filed the day before the trial began. The inference is that defense counsel had met with Deen, gone over what he would say from the witness stand, and then planned on calling him in the defense's case. The prosecutor's position was that Deen lied when he told Detective Cabrera that he was the Optima's passenger and owned the gun found at the scene. The phone call from the jail corroborated the prosecutor's position. We assume that in preparing to cross-examine Deen as a defense witness, the prosecutor had become familiar with Deen's criminal record and any other adverse information that could be used to attack his credibility. We also assume that the prosecutor realized that if defense counsel presented Deen as as a witness, Deen might commit perjury. We further assume that the prosecutor realized that if Deen committed perjury, defense counsel might become targets in a grand jury investigation focusing on the possibility that they suborned the perjury. So, why would the prosecutor say that defense counsel "have every opportunity to subpoena [Deen] and call him," and "[defense counsel] can certainly call that person who confessed, without a doubt," and "I believe the way that they can elicit that testimony is through the subpoenaing of [Deen]"?

THE COURT: Well, that's not the issue.  The issue is can [defense counsel] question [Cabrera] about [the confession].

[PROSECUTOR]: The answer is no.  It's all hearsay.

THE COURT:  Well, I don't know that it is now that you're *opening the door* the way you are.  I mean, basically what you're saying is that the defendant had a scheme to have another person confess to the crime; and their position is, well, it wasn't a scheme -- I take it that's their position -- it wasn't a scheme at all.  Somebody else confessed to the crime and you're misinterpreting this, and they can corroborate that misinterpretation by bringing out the fact that someone actually came and confessed to the crime.

[PROSECUTOR]: [Defense counsel] can certainly call that person who confessed, without a doubt.

THE COURT:  Well, *I'm not sure they can't call [Cabrera] and question [him] about it*, to tell you the truth.  I'm not a hundred percent sure of that, because their position is -- I take it *their position is that the police failed to investigate because they were committed to the position that the defendant was the person with the gun no matter what*.

[PROSECUTOR]:  I believe *that is their position*.  I believe the way that they can elicit that testimony is through the subpoenaing of [Deen].  Anything that [Cabrera] would say about what [Deen] told [Cabrera] when [Deen] came in is an out-of-court statement offered for the truth.

(emphasis added).  As part of this exchange, the prosecutor asked the Court whether he should "play the next segment, [Segment 14:41 – 15:04]."  The Court reiterated what it said earlier, that Segment 8:00 – 13:24 is "*going to be completely relevant to what [defense counsel] said earlier and proffered as testimony*."  (emphasis added).  "*The issue is whether [they] can question the task force officer about it*."  (emphasis added).

25

At that point, the Court said: "I don't know. . . . Let's have the next witness and then we'll take a break and I'll think about it."

\*          \*          \*

*Commentary 3*

Defense counsel's strategy is working, and the Court plainly knows what it is: "the police failed to investigate because they were committed to the position that the defendant was the person with the gun no matter what." The prosecutor agrees: "that is their position." Cabrera's allegedly deficient performance is now on trial, and the prosecutor is on the defensive. He needs to defend Cabrera's did-nothing conduct in response to Deen's confession, and he will use Segment 8:00 – 13:24 of the March 8 phone call to do that. The phone call will prove that Deen came to the police station at Elysee's bidding as part of a scheme the two concocted.

The prosecutor's litigation of Cabrera's performance under the reasonable officer standard has the makings of a subsidiary trial prompted by the Third Theory.[40] Defense counsel's "effect on the listener" defense required the prosecutor to introduce evidence justifying Cabrera's conduct.

---

[40] Nothing in the record suggests that the Court or the prosecutor believed that Cabrera's allegedly deficient performance under the reasonable officer standard constituted a defense in itself, meaning that Elysee would be entitled as a matter of right to have it tried to the jury. This is unsurprising, as the idea of trying the adequacy of a police investigation as a stand alone issue

Elysee contends that the District Court's hearsay ruling applied to defense counsel's Third Theory. The colloquy quoted above casts doubt on this. The Court wasn't "sure" whether the defense could call Cabrera and have him relate the confession for a non-hearsay purpose, especially in light of the prosecutor's insistence on introducing Segment 8:00 – 13:24 of the March 8 phone call into evidence in the Government's case in chief.[41] In the Court's mind, if the prosecutor introduced Segment 8:00 – 13:24 into evidence, he may have rendered Cabrera's testimony about Deen's confession relevant and thus admissible.

Finally, the above colloquy makes it difficult to discern—even in hindsight—whether, in producing the recording and transcript of the jail call, the prosecutor's strategy was to introduce the entire recording in its case in chief or only the highlighted portions of the six segments. That aside, the Court made it clear that if the Government introduced Segment 8:00 – 13:24 in its case in chief, it may well have opened the door for the defense to introduce the Deen Confession in order to show its effect on Detective Cabrera.

---

has no support whatsoever in the cases defense counsel cited to the Court and Elysee cites in his opening brief. *See infra* part II.B.1.

[41] As the Court's remarks implied, the relevance of Deen's confession changed as the prosecutor altered his strategy about using all or part of Elysee's March 8 phone call, and the defense responded reflexively.

*          *          *

Lyboubomir Nikolov, a fingerprint expert, testified next for the Government. After he stepped down, the jury retired, and the Court asked the prosecutor why he wanted to introduce Segment 8:00 – 13:24 of the March 8 phone call in the Government's case in chief rather than on rebuttal:

> THE COURT:  I'm really actually a little confused and perplexed about this. . . .
>
> So, first of all, I could have sworn [that you, the prosecutor,] told me a few days ago that you wanted to admit this [jail call] because it would contain an acknowledgment by the defendant that he had dropped the gun. But I don't see that, and what you played didn't have anything to do with that.
>
> It also seemed that the portions you want to play, it seems a little backwards to me, because it seems as though what this would really be relevant to would be if I allowed the defense to get into this issue of . . . [Deen] coming into the police station and attempting to confess to the crime. So to me it seems kind of premature.  To me it seems like it would be most logically be offered to rebut that if I allowed the testimony. . . . So I'm really not quite sure what is the right thing to do with this.
>
> Actually, I really don't see that it's relevant since there is no evidence right now that the defendant actually tried to obstruct justice, which would be evidence of consciousness of guilt, right; just that he was thinking about it and suggesting to somebody else, maybe that's enough. . . .

Before the prosecutor could respond, the Court alluded to a remark Elysee made in Segment 28:28 – 30:20, "I got 18 shots, let's do it."  *See* Attachment 1 at 6.  The Court told the prosecutor that it had "no idea what he's talking about."  The Government provided the necessary context:

28

[PROSECUTOR]: So if I could provide context to a couple things. As far as the 18 shots is concerned, he's talking about a shoot-out that he was in, as he says on the tape, the Friday before.

THE COURT: So he had a gun with 18 rounds the Friday before.

[PROSECUTOR]: Which is the same magazine that he's alleged to have had in this case, and we can put on testimony that that magazine is somewhat unique to this gun.

THE COURT: Somewhat unique.

[PROSECUTOR]: It's not standard.  I can talk to the agent and ask how unique it is.

The prosecutor then continued, directing the Court's attention to Segment

16:08 – 19:00:

[PROSECUTOR]: . . . . But I only played for you the first segment that the Government wanted to use.  If I could turn your attention to page 4 of this transcript, the highlighted portion, this is the defendant claiming he was there, asking who was in the black Mustang.  That was the car that was behind them in the Kia.  The next thing he says: I'm not gonna lie.  I'm like I'm gonna drop this, which means, in street terms, he may shoot at them.

And then he goes on to say that he saw Officer Wilson's testimony today about the gray truck.[42]  He says: You know, we had pulled right next to them in the field.  That was them in the same truck.

He says later: That was them, the same truck.  Think about it.  That was the same gray truck trying to run me over me in the field, acknowledging, corroborating Officer Wilson's testimony today that he caught him off in the field in a gray truck.

---

[42] Elysee was apparently referring to Officer Wilson's testimony at a preliminary hearing.

*          *          *

*Commentary 4*

The prosecutor continues to litigate Cabrera's performance under the reasonable officer standard.  But he needs more than Segment 8:00 – 13:24 of the March 8 phone call; that was just the first segment he "wanted to use," implying that he wanted to introduce additional segments.[43]  In preparing for trial, the prosecutor highlighted portions of each segment of the transcript, which he claimed were "relevant" and constituted incriminating admissions of the accused.  So, it seems safe to assume that he intended to introduce at least the highlighted portions of the segments.  Of course, if the defense invoked the doctrine of completeness,[44] some unhighlighted portions would also be included.

*          *          *

Following the above colloquy, the Court questioned defense counsel to determine whether Elysee "denied that he jumped out of the car or . . . that he [both] jumped out of the car and dropped a gun."  They replied, "We're denying that he jumped out of the car and dropped a gun."  They then added that Elysee was the driver of the Optima.  In support, they pointed to a statement Elysee made in Segment 8:00 – 13:24 as corroboration: "I did initially pull over."

---

[43] Apparently, the additional segments would not be introduced to explain why the police didn't pursue Deen as a suspect—the service Segment 8:00 – 13:24 seemed to provide.

[44] Fed. R. Evid. 106.

Next, the Court asked defense counsel for their position on the "admissibility of the transcript." They argued that the entire call should be excluded—particularly the reference to the "18 rounds" and a "shoot-out"—because the danger for unfair prejudice outweighed the call's probative value.

After these exchanges, the Court put defense counsel's objection aside and focused on the consequences of the prosecutor's introduction of the entire jail call:

> THE COURT: . . . So let's just play this out for a second.
>
> So, if I were to allow this [entire call], as the Government would like me to do, then it seems to me that the defense would have every right to ask -- especially if the Government is able to advance its position as to what it is that the defendant is saying -- that the defense would have every right to ask: And did anything happen consistent with what the Government is claiming is described on this tape. And the answer is yes. And the next question is: Well, what happened? And the next answer is: Well, Darius Deen showed up at . . . the Homestead Police Department.
>
> . . .
>
> And, *not offered for the truth, he offered to confess*.
>
> [DEFENSE COUNSEL]: Absolutely, Your Honor.
>
> THE COURT: I don't even know why [the defense would] even have to go any further than that. I mean, to me, [Deen] *offered to confess*. It's *not offered for the truth*. It's *offered to show what he did*.
>
> And the next question is: Well, what did you do in response? And the answer is: Nothing. I guess. Is that the answer?
>
> [DEFENSE COUNSEL]: That is exactly where we're going to be going with it, Your Honor. And *we're pulling some cases as well that we believe are on point*. We can alert the Court.

THE COURT: I mean, without even getting into the circumstances of whatever it is that Darius Deen said, didn't say, whatever, without even getting into the content of what he said, the guy came in and he *offered to confess*. Is that what he did?

[DEFENSE COUNSEL]: Exactly, Your Honor.

THE COURT: He said: May I make a statement?

[DEFENSE COUNSEL]: And he identified himself as the passenger.

THE COURT: Well, I don't know that I would allow that.

[DEFENSE COUNSEL]: Right. But that he *offered to* come in and *confess*, yes, Your Honor.

THE COURT: Yes.

(emphasis added)

\*            \*            \*

*Commentary 5*

Assuming the prosecutor introduced the recording of the entire March 8 phone call in the Government's case in chief, the Court believed that he would have invited the defense to respond with Cabrera's testimony about his encounter with Deen as a matter of fairness: the defense could introduce Deen's "offer to confess" not to establish the truth of what Deen said but, instead, as conduct to show that Cabrera failed to do what a reasonable officer would have done in response. Defense counsel quickly agreed.

32

There was no discussion about what Cabrera might be able to say under the "offer to confess" rubric.[45]  What words could Cabrera use to describe Deen's offer to confess that he was the Optima's passenger and owner of the gun without stating what Deen actually said, or at least the gist of it?

With respect to the confession's relevance to show its effect on the listener, defense counsel announced that they were "pulling some cases . . . that . . . are on point."  This is the first indication in the record that defense counsel were researching the admissibility of Cabrera's response to the information Deen provided him at the Homestead Police Station.

*          *          *

After the Court explained why Cabrera's recitation of Deen's offer to confess might be admitted for the non-hearsay purpose of establishing its effect on the listener *if* the prosecutor insisted on introducing the recording of the entire jail call in the Government's case in chief, the prosecutor informed the Court that he would go one step further and introduce in rebuttal an additional call Elysee made from the jail.

---

[45] Elysee's brief contains no indication of the questions defense counsel could have asked Cabrera and the answers he could have given that would yield the ultimate fact: an offer to confess.

[PROSECUTOR]:  Your Honor, I understand the Court's position.  I want to make the Court aware . . . there is an additional jail call . . . that's more explicit about the concocting of this story.

. . . [T]o the extent that they open the door about did [Deen] confess, that's going to open another jail call which is more explicit about concocting the story that we have no intention of using ever.  But if [Deen's offer to confess] comes in, then [this more explicit call] becomes highly probative of the veracity of Mr. Deen's statement to the Homestead Police Department. . . .

[DEFENSE COUNSEL]:  Your Honor, sorry to complicate matters further.  But that opens another door, in our view, which is there's a video-recorded statement of Mr. Elysee the night of his arrest.  Within an hour of the arrest, Officer Wilson is questioning Mr. Elysee and he says I was the driver.  That was before he could have ever spoken to this Darius Deen.

There's no way they could have concocted a story when they both ran in separate directions.  Darius Deen was not there.  He was saying he was the driver from the night of his arrest.  And I think that if they get into this concocting a story, I think that opens the door to us getting into a . . . statement of Mr. Elysee having said he was the driver on the day of his arrest . . . .

They're saying that our guy concocted a story with Darius Deen.  We're rebutting that by showing that our guy said he was the driver when there was absolutely no way he could have had any kind of conversation with Darius Deen . . . .

. . .

And, Your Honor, he said Darius was the guy in the car with me the night that he was arrested in the video statement.

34

At the Court's request, the prosecutor played the additional call,[46] representing that it more explicitly showed Elysee concocting a scheme to have Deen confess. After the call was played, the Court declared a ten-minute recess.

\*          \*          \*

*Commentary 6*

At this point, the following scenario appeared to be unfolding: (1) the prosecutor would introduce the recording of the March 8 phone call[47] in the Government's case in chief (assuming the Court overruled the defense's objection, under Federal Rule of Evidence 403, that its probative value was substantially outweighed by the danger of unfair prejudice); (2) the prosecutor having "opened the door," the defense would proffer—and the Court would admit—Cabrera's testimony as proof that Deen made an offer to confess to show its effect on the listener, *i.e.,* the inadequacy of Cabrera's response to the offer; (3) the defense having further "opened the door," the prosecutor would present in rebuttal the "additional" jail call; and (4) the prosecutor having "opened the door" a second time, the defense would introduce in surrebuttal the video tape of the statement Elysee made to the police following his arrest on March 4.

---

[46] The prosecutor informed the Court that he did not have a transcript of the call.

[47] Or, at the very least, the prosecutor would introduce the portions highlighted in the transcript of the call subject to the introduction of other portions under the doctrine of completeness. *See* Fed. R. Evid. 106.

Put concisely, the prosecutor's introduction of the recording of the March 8 phone call—in an effort to defend Cabrera's response to Deen's confession—would render relevant Cabrera's testimony about Deen's offer to confess.[48]

As detailed below, when the hearing *in limine* resumed, the Court explained that the parties could go through these four steps or not; it was up to them. In response, the prosecutor had a sudden change of heart. He rejected the four-step process and changed course. He apparently realized that his plan to introduce Segment 8:00 – 13:24 in the Government's case in chief was misguided. As the Court said, he would be putting things "backwards." Moreover, introducing Segment 8:00 – 13:24 would "open the door" for defense counsel to get Deen's confession before the jury and corroborate what defense counsel told the jurors in their opening statement.

For obvious reasons, the prosecutor wanted to avoid that. So, as indicated in the text below, he abandoned his strategy of introducing the March 8 phone call in its entirety. He would limit the call to one segment, Segment 16:08 – 19:00, which would not open the door for the admission of Cabrera's testimony about his

---

[48] The phone call and the offer to confess would be the beginning and end of the subsidiary trial on the adequacy of Cabrera's performance under the reasonable officer standard. *See infra* part II.B.2. Presumably, if the jury found that Elysee and Deen concocted a plan to have Deen confess as the prosecutor contended and Cabrera knew about it, the jury could find that his response satisfied the reasonable officer standard.

encounter with Deen at the police station. And he would, in effect, abandon his strategy of litigating Cabrera's response to Deen's confession under the reasonable officer standard. Whether or not defense counsel realized it, if Cabrera's performance under that standard was to be litigated, they, instead of the prosecutor, would have to carry the ball, and they would have to carry it in their own case.

*          *          *

After a ten-minute recess, the hearing *in limine* resumed. The Court thought about the back-and-forth "open the door" sequences the parties had presented and concluded that if the parties wanted to try the case that way, so be it.[49]

> THE COURT: . . . So here's what I think. I think either it all comes in or none of it comes in. So you choose.
>
> THE COURT: And when I say "all of it comes in," what I would let the defense do is bring out the fact that Darius Deen showed up at the Homestead Police Department. . . . And *offered to confess*. I would not allow them to get into what he said. But they're going to then ask whoever is testifying, whether it's in their case or your case, and what did you do in response. And I suppose, in sum and substance, the person is going to say, nothing. And then you're going to get up on cross and you're going to say, why not. And then they're going to go into this whole thing and open a door for them to ask more questions.
>
> . . . It's sort of an all or nothing situation. I'm not going to let it be chopped up. So you decide. Why not let the jury hear it all.

---

[49] We assume that, in the Court's view, if that was the way the parties wanted to try the case, any error it committed would have been invited and beyond appellate review.

(emphasis added).

The prosecutor responded as if the Court had not just spoken. He withdrew his proffer of the entire March 8 phone call with the exception of one segment, Segment 16:08 – 19:00. That segment, he said, was highly relevant because it showed that Elysee was the passenger in the Optima.

> [PROSECUTOR]: Your Honor, . . . if we limit [the phone call] to just his statements about what happened that night [as depicted in Segment 16:08 – 19:00], nothing about this concocting of a story [in Segment 8:00 – 13:24], nothing about this other call [I just played for the Court], it's just his statements --

> THE COURT: But the whole thing is about -- from your perspective -- I mean, I have no idea what the truth is. But from your perspective -- and I have to admit from . . . reading it in the context that the Government wants me to read it in, everything that's on the first three pages pretty much of this statement of March 8, 2018, is --

> [PROSECUTOR]: You're absolutely right. Most of it is. What I'm suggesting is limited to pages 4 and 5, [Segment 16:08 – 19:00,] where he's talking about the black Mustang.

> And in particular, Your Honor, most important, perhaps, is on page 5, when he talks about, "I thought it was over when he hit the pole, I ain't never hit no pole." He's explicitly saying he is not the driver because he's never hit a telephone pole.

> THE COURT: Well, maybe he's saying I never hit a telephone pole before.

> [PROSECUTOR]: In the context, he's saying that person crashed. I thought it was over then. Air bags then popped out, hit a pole. I ain't never hit no pole.

> And then before that, [again in Segment 16:08 – 19:00] Your Honor, the recipient is talking about: Do you remember that day, we were talking

38

about how we never got caught with a hammer?  And he says: Truly.
Recipient says: That's crazy, that's crazy.  The same day we talked about it.
And the hammer is obviously a gun.  And he responds: I'm always saying
that.  It's like I talk that up on myself.  He's like: But those crackers aren't
getting me like that.

He is explicitly saying that that day he was with a gun -- I mean, that
is --

. . . .

THE COURT: . . .  How far did you want to go on page 5?

[PROSECUTOR]: Just that segment.  So it would stop in the middle
of page 5.

THE COURT: To where it says: That bitch come out the ground,
man?

[PROSECUTOR]: Yes.  That would be the last.

THE COURT: I just don't see it.  So what is it you want to offer it to
prove?  Maybe you could explain that to me.

[PROSECUTOR]: Particularly on the defendant's last full paragraph
in that segment, he's talking about how he talked it into himself that he got
caught that day with the hammer.

THE COURT: I don't really see that.  Could you just point that out to
me?

[PROSECUTOR]: So it starts with the first highlight on page 5 and
the recipient saying: You remember that same day, we were talking about
how we never got caught with a hammer.

THE COURT: I have no idea what date they're talking about.  That
could have been two weeks earlier.

[PROSECUTOR]: So, if you go a little earlier, they're talking about
the black Mustang that was following them and the same gray truck that --

39

THE COURT: Well, if I thought the person he was talking to knew anything about or was there, I might agree with you. I don't see it. I have no idea who he's talking to. You don't know who he's talking to.

[PROSECUTOR]: Agreed.

THE COURT: They could have said -- putting aside that clause, "Hey, you remember that same day, brah," I don't know what day they're talking you about.

Then it says: "We was talking about, uh, how we ain't never get caught with a hammer."

I don't see that it conclusively reflects that this is the day of the event. And even if it were the day of the event, I don't see how saying, "We was talking about how we ain't never get caught with a hammer" is an admission that he had a gun on that day.

[PROSECUTOR]: So there's context to show that I think it is the same day.
But to your next point, his response is: Truly. He laughs and the recipient says something. But then the defendant says: And I'm always saying that. It's like I talk that up on himself. Right, he talked that into existence.

THE COURT: Right. He kept telling himself, don't ever get caught with a hammer.

[PROSECUTOR]: And then he talked about it that day and then he gets caught with a hammer.

THE COURT: Well, it doesn't actually say that. It says, "I ain't never hit no pole or seen or actually when bitch hit pole that shit came out on the ground." He doesn't say "I dropped it."

[PROSECUTOR]: Agreed. He's saying there's another driver, though.

40

THE COURT: He's saying there was a gun in the car.  When the car crashed, the gun came out of the car.  I don't see that he's saying the gun was in my hand and I dropped it.

[PROSECUTOR]: Your Honor, the Government would just suggest that he is referring to the pole and the pole coming out of the ground as something that he did not hit and, therefore, was not the driver and was the passenger.

THE COURT: So you're offering it not to show that he was in possession of the gun but to show that he was the passenger in the car.

[PROSECUTOR]: And it's highly probative because the gun is found next to the passenger door, and it's highly probative to corroborate Ireland's and Wilson's and Garcia's testimony that he was the passenger that got out and dropped the gun.

THE COURT: Okay.  So it's offered to prove he was the passenger in the car.

[PROSECUTOR]: Correct.

At the conclusion of this exchange, the Court turned to defense counsel and asked for their reaction to the prosecutor's proposal to introduce only Segment 16:08 – 19:00 of the phone call in the Government's case in chief.

THE COURT: . . . What does the defense say to that?  And when I say "that," I mean their proposal that they play just [Segment 16:08 – 19:00] and they're offering it just to show he was the passenger in the car, not the driver.

[DEFENSE COUNSEL]: Your Honor, I guess the jury could decide. But it's just so unclear that that is even what is being said here.

But secondly, this colloquy is so prejudicial.  I mean, they're using offensive language.  I think it's highly prejudicial, some of the words that

41

are being said, some of the things that are being said. I think its probative value is highly limited.

And here, also, they have two officers who are going to testify that they saw him at the passenger door.

THE COURT: That's your only objection?

[DEFENSE COUNSEL]: I think it's irrelevant. I don't think that they've made a sufficient showing that it actually shows he's coming out of the passenger door. So I object on relevant grounds, unfair prejudice.

And I would also just add, Your Honor, under the rule of completeness --

THE COURT: Oh, you can play the whole thing. I have no problem with it.

THE COURT: It's a single phone conversation. Even though it's divided into segments, it's a single phone conversation.

THE COURT: Okay. Well. I guess we're off and running. If you want to play any of it, it's all coming in, except I'm not going to allow --- *whether the officer who spoke to Darius Deen is called in the Government's case or in the defense case, I'm not going to allow questioning as to what Darius Deen said about what he was doing that night.* But other than that, it's all going to come in.

. . .

[DEFENSE COUNSEL]: *Darius Deen's statement about him having been the passenger in the car –*

THE COURT: *I'm not going to allow it. It's hearsay.* Bring him in. Where is he? He can come and testify I was the passenger in the car.

. . .

THE COURT: Is he not around? What is the problem with bringing him in?

42

. . .

[DEFENSE COUNSEL]: We're considering trying to bring him in, if available, Your Honor.

THE COURT: Okay. So, look, it's one phone call. I don't know why or how I would preclude them from putting in the rest of the phone call. So, if you want to go down this road, then we'll go down the road.

(emphasis added).

\*          \*          \*

*Commentary 7*

By this point, the scope of the hearing *in limine* had been scaled down significantly. When it began, defense counsel presented three issues: (1) whether Cabrera could relate what Deen told him to prove "who actually had the gun," (2) whether Cabrera could relate what Deen told him to challenge "officer credibility," and (3) whether Cabrera could relate what Deen told him to show its "effect on the listener." The Court resolved the First Issue right after the hearing began: the hearsay rule barred Cabrera from relating what Deen said to prove who actually had the gun. The Second Issue fell by the wayside because defense counsel never attempted to use Deen's confession to impeach an officer's testimony. The applicability of the Third Issue—specifically, the relevance of Cabrera's conduct following his encounter with Deen—varied depending on the doors the prosecutor would have opened for the defense if he introduced in the Government's case

43

Segment 8:00 – 13:24 of the March 8 phone call, the portions of the call he had highlighted, or the entire call itself. The extent to which each scenario would open or close a door seemed to expand or contract the relevance of Cabrera's testimony. In the end, as revealed in the text below, the prosecutor, having become aware that his initial approach was "backwards" and "premature" and would open the door as the Court observed, abandoned Segment 8:00 – 13:24 and closed the door. Thus, the immediate question became whether the Court should sustain the defense's relevancy objection to Segment 16:08 – 19:00 and, if not, whether, under Federal Rule of Evidence 403, that segment's probative value was substantially outweighed by the danger of unfair prejudice.

*          *          *

The Court next addressed and answered the question of whether the rule of completeness required the introduction of the entire call if Segment 16:08 – 19:00 were introduced:

> [DEFENSE COUNSEL]: Your Honor, I understand the Court's ruling is that if some comes in, under the rule of completeness the entire tape comes in.

> THE COURT: If that's your objection.

> [DEFENSE COUNSEL]: Not the things we would select to play from the tape. We can't selectively play it.

> THE COURT: No.

44

*          *          *

*Commentary 8*

We note that defense counsel misread the rule of completeness.[50]  If the prosecutor introduced Segment 16:08 – 19:00, the rule would not enable the defense to introduce portions of the call that were unrelated to Segment 16:08 – 19:00.  Of course, nothing would preclude the defense from introducing, in its case, other portions of the call.  If it did so, the prosecutor could then invoke the rule of completeness itself and introduce additional sections of the call that made the portions introduced complete.

*          *          *

Following the discussion about the application of the rule of completeness, defense counsel turned the Court's attention to their Third Theory for the admissibility of Deen's confession.  "The only other thing that [we] would ask to put on the record is that [our] initial argument was that we believe the evidentiary

---

[50] *See* Fed. R. Evid. 106.  Rule 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." *Id.*

45

theory for Darius Deen's statement coming in was based on effect on the listener."[51]  The Court's response:

> I have not heard enough to persuade me that that would be *a legitimate way to get his hearsay statements in*.  Maybe we'll have to hear the testimony of the officer outside the presence of the jury.  *I'm not going to allow it in the Government's case*, any of it in the Government's case.
>
> [DEFENSE COUNSEL]: Right.  To the extent that a prima facie proffer would help, I think that this is –
>
> THE COURT:  *No.  I'd have to hear* [Cabrera's] *testimony outside the presence of the jury to allow that.*[52]
>
> [DEFENSE COUNSEL]:  Okay, Your Honor.  There was one case that I want to cite, which is 432 F.3d 1189.  I have copies for the Court, Eleventh Circuit case.
>
> THE COURT:  Okay.  Well, I'm happy to look at the case and *I'm happy to hear* [Cabrera's] *testimony outside the presence of the jury.*
>
> [DEFENSE COUNSEL]:  Thank you.
>
> THE COURT:  *You can't possibly object to that, can you?*
>
> [DEFENSE COUNSEL]:  *No.  It's very reasonable*.

---

[51] It was not until this moment in the hearing *in limine* that defense counsel made it abundantly clear that their purpose in introducing Cabrera's testimony *was not* for the purpose of proving that Deen was the passenger in the Optima and the one with the gun.  They wanted to show its effect on the listener.

[52] The Court was implying that the speaking proffer defense counsel made when the proceedings resumed in the morning that day was inadequate.  Defense counsel of course knew that their speaking proffer was inadequate; that's why they asked for leave to examine Detective Cabrera when he took the stand to testify as a prosecution witness later in the day.  We assume that the Court wanted to hear what Cabrera had to say to determine first whether it was relevant to show the effect on the listener, and if so, whether a limiting instruction would suffice to ameliorate the prejudice that could result from the jury's acceptance of what Deen said as true.  *See* Fed. R. Evid. 403.

(emphasis added).

\*          \*          \*

*Commentary 9*

By now, the prosecutor has abandoned his effort to prove that, in light of the incriminating statements Elysee made during the March 8 phone call, Cabrera's response to Deen's confession conformed to what a reasonable officer would have done—treat the confession as bogus. Defense counsel would have to challenge the adequacy of Cabrera's response in their client's case. Two other observations are also in order at this juncture.

First, in Commentary 3, we noted Elysee's contention that the District Court's hearsay ruling—precluding defense counsel from eliciting Deen's confession from Cabrera to prove who had the gun—applied to their Third Theory of admissibility, to show the confession's effect on the listener. The Court's exchange with defense counsel strongly suggests otherwise. The Court was willing to hear defense counsel's proffer of Cabrera's testimony outside the presence of the jury. It thus made it clear that it would not rule on the basis of the speaking proffer defense counsel made just before the hearing *in limine* began. It "ha[d] to hear" Cabrera testify in person.

47

Second, the Court repeated itself in stating that it would not allow Cabrera to recite what Deen said "in the Government's case." The Court was apparently considering the possibility that defense counsel would attempt to elicit Deen's statements in cross-examining Cabrera, who was scheduled to be the Government's next witness. But nothing in the record suggests that defense counsel planned to do that. Rather, their intent was to recall him as a defense witness. They had informed the Court of their intent to recall him just before the hearing *in limine* began, suggesting that it would be most efficient if the Court allowed them to proffer Cabrera's testimony while the Government was presenting its case in chief and then ruled on any objection the prosecutor may have had to his testimony. In stating that it would be happy to hear their proffer outside the presence of the jury, the Court was complying with defense counsel's request.

*          *          *

After informing defense counsel that they would need to call Cabrera and examine him outside the presence of the jury before it ruled on his recitation of Deen's confession, and what he did in response, for its "effect on the listener," the Court turned to the authenticity of the jail call recording. The defense conceded its authenticity, and the recording was admitted in evidence as Government's Exhibit 12. A transcript of Segment 16:08 – 19:00 was marked for identification as Government Exhibit 12-A.

48

After the Court recessed for lunch, the hearing *in limine* continued.

>   THE COURT: So, as I understand it, the defense is withdrawing the various objections it made and is agreeing to the admission of [Segment 16:08 – 19:00].

>   . . .

>   [DEFENSE COUNSEL]: Yes, Your Honor.  We're withdrawing our rule of completeness objection. . . . We objected to the introduction of the entire call on relevance, unfair prejudice and late disclosure, and we had initially made an objection on rule of completeness.  We're withdrawing that now that the Government is seeking to introduce just [Segment 16:08 – 19:00].

>   THE COURT: Okay.  But you're maintaining . . . the . . . objection, undue prejudice because of the language used?

>   [DEFENSE COUNSEL]: Yes, Your Honor.

>   THE COURT: Okay.  Well, that's overruled, the undue prejudice because of the language used.

With that, the hearing *in limine* concluded, and the trial resumed.  The prosecutor played Segment 16:08 – 19:00 of the jail call, as agreed, and then called Cabrera to the witness stand.[53]  On direct examination, Cabrera testified very briefly about an issue that, as expected, had nothing to do with Deen's confession—the meaning of the word "hammer" in Segment 16:08 – 19:00.[54]

---

[53] By this time, the prosecutor had decided to forgo his defense of Detective Cabrera's response to Deen's confession under the reasonable officer standard.  His direct examination of Cabrera avoided any mention of the confession and Cabrera's response.

[54] Specifically, Cabrera testified that the term "hammer" is slang for a firearm.  This testimony was relevant because, in the Segment 16:08 – 19:00, Elysee and another individual used this term.

Defense counsel did not cross-examine Cabrera.[55] Nor did they take up the Court's offer to hear his testimony outside the presence of the jury.

After Cabrera stepped down, the Court adjourned the proceedings for the day. With the jury out of the courtroom, the parties stipulated to the defense's introduction in evidence of an automobile rental agreement for the Optima, which showed Ferguson Abraham as the renter and Elysee as an "additional driver." After defense counsel announced that they would not be calling any witnesses and the times allotted for the parties' closing arguments were agreed to, the Court made the following comment about the Eleventh Circuit cases defense counsel had cited in support of their "effect on the listener" argument:

> I just want to say one thing about *those cases* that were provided to me by the defense. I found them utterly unhelpful. In every one of *those cases,* as I recall, they stood for the sort of unremarkable proposition that a statement that is offered to show the effect on the hearer and then the hearer takes some action based on the statement can under certain circumstances be admissible.
>
> In this case, what the defense wants to do is to get into this statement to show that nothing happened, and there isn't a single case that I've been able to locate that makes that appropriate.

---

[55] In his opening brief in this appeal, Elysee makes this statement as to why defense counsel did not cross-examine Cabrera: "In light of the court's earlier ruling, the defense could not, and therefore did not, cross examine Officer Cabrera regarding Darius Deen's confession and how Cabrera responded to it. (*See id.* at 303)." Appellant's Br. at 21. The citation listed in Appellant's opening brief is to the transcript of the second day of trial, after Cabrera testified. But page 303 contains nothing to support the brief's quotation. Moreover, the brief does not indicate when the Court made the "earlier ruling." The brief overlooks the fact that defense counsel could not have cross-examined Cabrera regarding Deen's confession because the questioning would have been well beyond the scope of Cabrera's direct examination, the prosecutor would have objected to the questioning for that reason, and the Court would have sustained his objection.

So, thank you again for your utterly unhelpful cases. See you tomorrow.

(emphasis added).

\*          \*          \*

*Commentary 10*

Recall that the Court responded to defense counsel's earlier statement that they had an Eleventh Circuit case they "want[ed] to cite" in support of their "effect on the listener" evidentiary theory by informing defense counsel that it would be "happy to hear [Cabrera's] testimony outside the presence of the jury." That case was *United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005). In using the words "those cases," we assume that the Court was referring to *Baker*, *Hawkins*,[56] *Jiminez*,[57] and *Ransfer*[58] (cases Elysee's brief cites), the opinions of which defense counsel gave to the Court after the Court expressed a willingness to hear their proffer of Cabrera's testimony. By the time defense counsel announced that they would not be calling any witnesses in Elysee's defense, the Court had apparently glanced at the opinions, probably cursorily given the time constraints.

---

[56] 905 F.3d 1489 (11th Cir. 1990).

[57] 564 F.3d 1280 (11th Cir. 2009).

[58] 749 F.3d 914 (11th Cir. 2014).

51

The Court declared a lunch recess at 11:59 a.m. It lasted only 33 minutes, until 12:32 p.m. Shortly before the recess, defense counsel announced that "we're pulling some cases." We assume from that comment that defense counsel had nothing in the case law to support their Third Theory defense—that Cabrera's response to Deen's confession was deficient under the reasonable officer standard of performance.

As indicated in part II.B.1 *infra*, none of the cases defense counsel cited supported their Third Theory.

\*          \*          \*

The next morning, the final day of the trial, the prosecutor called his last witness, Officer Ireland. After Ireland testified, the Government rested its case in chief, and defense counsel moved for a judgment of acquittal. The Court denied their motion. Defense counsel then announced that the defense rests. They did so without accepting the Court's offer to hear Cabrera's testimony outside the presence of the jury.[59]

The parties' closing arguments to the jury tracked the evidence the Government had introduced in its case in chief. In their opening statement at the start of the trial, defense counsel had given the jurors a play-by-play description of

---

[59] The trial transcript contains no indication as to why defense counsel decided to forego the Court's offer.

Deen's appearance at the Homestead Police Station and told them that they were "going to hear exactly what the officers at Homestead did with [the] information" Deen provided. The jurors retired to deliberate with defense counsel's words still in their minds and the Court's instruction about the evidence they were to consider: "[Y]ou must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and is not binding on you."[60] We assume the jurors complied with the Court's instruction.

The jury retired to deliberate at 12:19 p.m. After submitting a question to the Court not pertinent here and receiving an answer, it returned a verdict at 3:27 p.m. finding Elysee guilty as charged.[61]

---

[60] In his closing argument, the prosecutor decided not to comment on defense counsel's failure to introduce evidence of Deen's appearance at the Homestead Police Station, the exculpatory information he provided, and the police officers' explanation of what they did with that information. The prosecutor ran the risk that the jury might conclude that Deen was the Optima's passenger and the one with the gun and acquit Elysee. After all, the Court instructed the jury that Elysee did not have to testify or offer any evidence in his defense and that the Government had the burden of proving his guilt beyond a reasonable doubt. It would not be unreasonable to believe that at least one juror would take those instructions to heart and conclude that the Government had not met its burden. The prosecutor may have taken that risk in order to avoid the probability that, if convicted, Elysee would move the Court pursuant to 28 U.S.C. § 2255 to vacate his conviction on the ground that defense counsel, in failing to keep their opening statement promise to the jury about Deen's confession, deprived him of his Sixth Amendment right to effective assistance of counsel.

[61] The question was: "Does being inside of a car with someone that has a gun constitute joint possession of that weapon"? With the agreement of counsel, the Court referred the jury to a section of its instructions which the jury had in its possession.

*         *         *

*Commentary 11*

It is obvious that neither party was prepared to try this case. Both sides

knew that Deen had gone to the Homestead Police Station and confessed. Both

sides were privy to the recording of the March 8 phone call Elysee made from the

jail just four days following his arrest. The calls suggested that Deen's appearance

at the police station was in execution of a scheme Elysee and Deen concocted.

Defense counsel listed Deen as a defense witness the day before the trial began. If

he testified and adhered to what he told Cabrera at the police station, he would

likely become the target of a perjury investigation. And defense counsel would

become witnesses.[62] Defense counsel were in a predicament.

Both sides caught the District Court off guard; they tested the Court's

patience to the nth degree. Neither side had any idea whether defense counsel's

theory that Cabrera failed to act as a reasonable officer was relevant. Neither had

researched the point. They simply assumed that Cabrera's conduct was relevant.

---

[62] Deen was not their client, so the attorney-client privilege would not have attached. If Deen was their client, the crime-fraud exception would eliminate the effect of the privilege. *See Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) ("[T]he crime-fraud exception removes the 'seal of secrecy' from attorney-client communications or work product materials when they are made in furtherance of an ongoing or future crime or fraud."); *In re Sealed Case*, 162 F.3d 670, 674 (D.C. Cir. 1998). Defense counsel would also likely have a conflict of interest in representing both Elysee and Deen. *See* Fla. R. Prof. Cond. 4–1.7(a).

So, the prosecutor, at least initially, assumed the task of upholding Cabrera's allegedly do-nothing response to Deen's confession.

We suspect that defense counsel rejected the Court's offer to hear Cabrera's testimony outside the presence of the jury because they realized what the hearing would have looked like, which we describe in detail in part II.B.2.  At the end of that hearing, the Court would have a complete picture of not only the criminal investigation of Elysee, but of Deen's background as well.  At that point, the District Court would have to answer two questions: (1) whether Cabrera's performance in response to the Deen confession was relevant and (2) whether the probative value of Deen's confession was "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time."  Fed. R. Evid. 403.  Our analysis of those issues follows.

## B.

Elysee's argument on appeal is that the District Court "precluded the defense from questioning [Cabrera] about Darius Deen's confession and Cabrera's response to it on the erroneous ground that the confession was hearsay."[63]  This

---

[63] We note that, on a number of occasions, Elysee asserts that the Deen confession would not be offered for its truth.  Put gently, this is a disingenuous *post hoc* explanation.  Even the most charitable read of the trial transcript makes abundantly clear that defense counsel sought to use Deen's confession to show that Deen was guilty, and Elysee was innocent—that Homestead police arrested "the wrong guy."

argument rests on two factual premises: (1) that the District Court made a

definitive ruling[64] and (2) that the ruling was based on hearsay grounds.  Because

we believe that Elysee's challenge fails on the merits, we will assume arguendo

that these premises are supported by the record.[65]

---

[64] In the context of an *in limine* hearing, a district court may make either a preliminary or definitive ruling.  The nature of the ruling determines the steps the proponent must take to preserve the issue for appeal.  If the ruling is preliminary, the proponent must subsequently attempt to offer the evidence at trial in order to challenge the ruling on appeal.  *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 519 (3d Cir. 1997).  By contrast, the proponent need not take any additional steps to preserve the issue if the district court's ruling is definitive.  Fed. R. Evid. 103(b).  Because Elysee did not attempt to question Cabrera at trial about Deen's confession, his hearsay challenge would be abandoned if the District Court's ruling were preliminary.

[65] As reflected in the preceding discussion, the record is unclear on the matter.  Recall that defense counsel, at the outset of the hearing *in limine*, presented three theories for the admissibility of Deen's out-of-court statements through Cabrera.  First, the statements would show who had the gun.  Second, they would reflect on officer credibility.  And third, they would demonstrate "the effect on the listener."  There is no doubt that the District Court reached a definitive ruling with respect to the first theory.  As the Court said, "I think it's offered for the truth.  So I'm not going to allow it."  Less clear is whether the Court ever ruled on the second and third theories of admissibility.  For purposes of this appeal, we are only concerned with the Third Theory.

As we discussed in the previous section, there are several reasons to doubt that the District Court precluded defense counsel from eliciting the testimony for its "effect on the listener" at the same time it ruled that the testimony could not be used to show "who actually had the gun."  Chief among them is the Court's subsequent offer to hear Cabrera's testimony outside the presence of the jury.  The Court stated that it had "not heard enough" to be persuaded that Deen's statements were admissible for their "effect on the listener," and that it would "have to hear [Cabrera's] testimony outside the presence of the jury to allow [it]."  Thus, it seems the Court had not ruled out the possibility of allowing the testimony under the Third Theory; its admissibility was contingent on a proffer demonstrating that "the effect on the listener" was an applicable non-hearsay use under the circumstances.  Because defense counsel never made such a proffer, that was the last the Court said on the matter.

At the same time, we acknowledge some ambiguity.  While the Court did indicate that it could be convinced that the testimony was admissible for its "effect on the listener," it also stated in the same breath that "I'm not going to allow [Deen's statements] in the Government's case."  Thus, the Court seems to have reached a definitive ruling that the testimony would not appear in the Government's case, at least.

We have no doubt that Deen's out-of-court statements would not be hearsay if offered merely to demonstrate their "effect on the listener." *See* Fed. R. Evid. 801(c) (defining "hearsay" as an out-of-court statement offered "to prove the truth of the matter asserted in the statement"); *United States v. Hawkins*, 905 F.2d 1489, 1494 (11th Cir. 1990) ("A statement is not subject to the hearsay rule . . . unless it is offered 'to prove the truth of the matter asserted.'"). Thus, assuming the District Court excluded the statements on hearsay grounds, it abused its discretion. *See United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) ("[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.").

Nonetheless, we can "affirm a district court's evidentiary ruling if it was correct on any ground." *United States v. Farley*, 607 F.3d 1294, 1333 n.25 (11th Cir. 2010) (citing *United States v. Cardenas*, 895 F.2d 1338, 1345 (11th Cir. 1990)). We identify two grounds on which to affirm.

First, Deen's confession was inadmissible because what it tended to show—the "affirmative defense" that Cabrera's conduct in responding to the confession fell below the reasonable officer standard of performance—was not relevant. Whether Cabrera's performance satisfied that standard was not an issue the Court would instruct the jury to resolve in deciding whether Elysee was guilty of

57

violating 18 U.S.C. § 922(g)(1).  And we find nothing in our precedent that would have deemed it an issue.  As we demonstrate below, the cases defense counsel presented to the District Court and the additional cases Elysee's brief cites are patently inapposite.

Second, assuming that Cabrera's performance measured against the reasonable officer standard was an issue in the case, a straightforward application of Federal Rule of Evidence 403 would bar its introduction.  The probative value of what Deen said would have been substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time.  We consider these two grounds in order.

1.

Elysee assumes the validity of an affirmative defense based on the purported failure of the Task Force to conduct its investigation consistent with the reasonable officer standard.  If such a defense were valid, then Deen's confession would be relevant to show that Cabrera did not respond to it as a reasonable officer would have.  *See* Fed. R. Evid. 401.  Elysee cites a handful of cases in support of his position, but we find that none provide any support for such a defense.

Elysee cited four of our decisions in the District Court.  Collectively, these cases stand for the proposition that the government in a criminal case may in some

58

circumstances introduce out-of-court statements through investigative officers either (1) to explain the course of a complex investigation or (2) to rehabilitate officers after the defense has impugned their motives or behavior in the investigation. Importantly, the statements may not be introduced for the truth of the matter asserted and should not be admitted if their probative value is substantially outweighed by a danger of unfair prejudice.

In *United States v. Baker*, we noted in dicta that "[s]tatements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement." 432 F.3d at 1208 n.17. However, we rejected this theory as a vehicle to admit an anonymous tip implicating defendants in a triple homicide because the investigation "was not a complex endeavor." *Id.* at 1208. The tip did not "shed any [] light on why" the investigation was conducted in the manner that it was. *Id.* Instead, the tip's only relevance was to establish that defendants committed the homicides. *Id.* at 1208–09.

In *United States v. Ransfer*, we reiterated the principle observed in *Baker* that the government may sometimes admit out-of-court statements to explain the course of a police investigation. 749 F.3d 914, 925 (11th Cir. 2014). This time,

59

unlike in *Baker*, we found that the investigation was sufficiently complex: "Sergeant Villaverde supervised a months-long endeavor to identify and locate multiple perpetrators who engaged in a series of armed robberies and car thefts." *Id.* at 927. However, we found it unnecessary to decide whether the District Court properly admitted out-of-court statements to show why, among other things, the police believed the series of robberies had common perpetrators, because other evidence in the record provided the same content as the challenged statements. *Id.*

The two other cases Elysee cited at the District Court stand for the related but distinct proposition that the government may sometimes introduce out-of-court statements to rehabilitate officers after the defense has impugned their motives or behavior in an investigation.

In *United States v. Hawkins*, we upheld the District Court's decision to allow—over defendants' hearsay objection—a postal inspector to testify about the number of complaints the postal service received about defendants' coupon-clipping business. 905 F.2d 1489, 1495–96 (11th Cir. 1990). We explained that the testimony "was properly admissible to explain why the investigation was launched, and to rebut the defense's claims that the Postal Service had no basis for investigating [defendants' business], but rather harassed [defendants] out of business and caused most of the complaints itself by shutting off [the business's] mail." *Id.* at 1495.

Our holding in *United States v. Jiminez* was similar.  564 F.3d 1280 (11th Cir. 2009).  There, we said the District Court properly allowed a detective to relate—in the prosecution's redirect—an out-of-court statement implicating defendant in a marijuana grow operation because it explained why the detective interviewed defendant a second time.  *Id.* at 1287.  "This became relevant precisely because the [defense's] cross-examination of [the detective] had suggested that there was something improper about the repeated interviews of the defendant."  *Id.*

Elysee has failed to convince us that these cases support his contention that Deen's confession was admissible to show that Cabrera and the other Task Force officers failed to act as reasonably diligent officers.  As we observed at the outset, this theory of relevance depends on the existence of an affirmative defense based on the failure of the police to conduct a reasonably thorough investigation. Nothing in the foregoing cases even hints at such a defense.  Furthermore, each of the above cases features the prosecution rather than the defense as the offeror. Elysee has not explained why we should extract from these cases the distinct and novel principle of law that the *defendant* in a criminal case may use out-of-court statements to mount an attack on the quality of the investigation that led to his indictment.

Elysee also cites three additional cases in his brief advancing the theory that Deen's confession was admissible to show Cabrera's "state of mind."[66]  As an initial matter, Elysee did not present this theory to the District Court and may not advance it for the first time on appeal.  *See Finnegan v. Comm'r of Internal Revenue*, 926 F.3d 1261, 1271 (11th Cir. 2019) ("The general rule is that we will not consider an issue raised for the first time on appeal.").  Instead, Elysee presented the theory that Cabrera's *conduct* in response to Deen's confession, not his state of mind, was deficient.  In any case, Elysee's new "state of mind" theory and the cases he cites in support of it are inapplicable.  The basic takeaway from these cases is that out-of-court statements may be admitted to show a party's state of mind if it is an issue in the case.  They provide no support for the assumption implicit in Elysee's argument—that Cabrera's state of mind was an issue in this case.

In *United States v. Rubin*, the government charged Rubin with "embezzlement in his position as a labor organizer by taking unauthorized salary increases, with knowledge that the increases were unauthorized, in violation of 29

---

[66] Elysee's brief cites a fourth case for the same proposition, *United States v. Rivera*, 780 F.3d 1084 (11th Cir. 2015).  However, we read *Rivera* to hold that certain recorded statements were admissible because they were not offered for the truth, but rather to "provide[] a context to assess Defendant's response," which would have otherwise been incomprehensible. *Id.* at 1092. As a result, *Rivera* is not a "state of mind" case, and thus we do not discuss it here.

U.S.C. § 501(c)." 591 F.2d 278, 282 (5th Cir. 1979).[67] Rubin's defense was that

he did not know the salary increases were unauthorized, and he attempted to

introduce out-of-court statements made to him by other union presidents to the

effect that the union constitutions that governed salary increases were "flexible,

living documents that could be interpreted to fit the needs of a particular local." *Id.*

at 283. The District Court excluded the statements on hearsay grounds, and we

reversed because the statements were "not offer[ed] . . . to prove the truth of the

matter asserted, but instead to prove that he had heard them and to establish their

effect on his state of mind." *Id.* The statements, we said, "would have

significantly helped establish Rubin's defense." *Id.*

Likewise, in *United States v. Cancelliere,* the defendant, Cancelliere, was

charged with bank fraud, making false statements to a financial institution, and

money laundering. 69 F.3d 1116, 1122–23 (11th Cir. 1995). Over his hearsay

objection, the District Court admitted letters from his father indicating that his trust

fund was depleted and that he would not help him financially. We held that

> the letters were not inadmissible hearsay. The government was required to
> prove two things. It had to prove (1) that Cancelliere made false statements
> to the banks (*e.g.,* that he was beneficiary of a trust fund; that he could count
> on financial help from his father, *etc.*); and (2) that Cancelliere knew that the
> statements were, in fact, false.

---

[67] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Id.* Again, the defendant's state of mind—whether he knew his statements were false—was a material issue in the case because it was part of the government's burden of proof.

Finally, in *United States v. Schlei*, the government charged Schlei with securities fraud—specifically, with knowingly attempting to sell counterfeit bond certificates. 122 F.3d 944, 951–52 (11th Cir. 1997). In defense, Schlei argued that he believed the bond certificates were genuine. *Id.* at 952. To prove knowledge, the government introduced statements from the deposition testimony of a woman who had been convicted of counterfeiting and distributing the very bond certificates that Schlei was charged with selling. *Id.* at 958. Schlei was present at the woman's deposition and heard her admit that the bond certificates were forged. *Id.* at 981. The District Court admitted the woman's statements over Schlei's hearsay objection, and we affirmed on the ground that the statements were "offered to demonstrate Schlei's state of mind regarding whether he believed the financial instruments were valid." *Id.*

In sum, the cases Elysee cites to support his theory that Deen's confession was admissible to show Cabrera's "state of mind" are inapposite. The glaring difference between those cases and Elysee's is that Elysee does not argue that Deen's confession somehow shows that he did not possess a particular state-of-mind that the government was required to prove. Instead, he argues the confession

64

bears on Cabrera's state-of-mind. The cases he cites lend no support to the notion that Cabrera's state-of-mind was an issue in the case.

Because nothing in our caselaw indicates the existence of an affirmative defense based on the failure of police to conduct an investigation as reasonably diligent officers, we conclude that no such defense exists. Elysee's theory of relevance for Deen's confession hinges on such a defense, and his theory therefore collapses. Deen's confession was inadmissible because it was irrelevant.

2.

In this subpart, we flip the script. Rather than rejecting Elysee's affirmative defense outright, we begin by (charitably) assuming that whether Cabrera's conduct in responding to Deen's confession satisfied the reasonable officer standard was an issue in this case. Implicit in Elysee's brief is the notion that defense counsel would have accepted the District Court's offer to hear their proffer of Cabrera's testimony had the Court been willing to allow Cabrera to recite what Deen told him at the police station. But even if we accept defense counsel's view of the case, we conclude that the proffer of Deen's confession would be inadmissible under Federal Rule of Evidence 403.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We believe the probative value of Deen's confession—even assuming the existence of Elysee's novel affirmative defense—was substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.

When out-of-court statements are offered for a non-hearsay purpose, the primary risk is that the the jury will take the statements not for the permissible use, but for the truth of the matter asserted. Whenever a district court admits a statement for one purpose but not another, it must, "on timely request, [] restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105.

However, a limiting instruction may not always sufficiently reduce the risk that the jury will misuse the statements. *See Bruton v. United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 1627 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); *United States v. Mateos*, 623 F.3d 1350, 1365 (11th Cir. 2010) ("[A] limiting instruction may be sufficient to cure the risk of undue prejudice *in limited circumstances*.") (emphasis added)). Sometimes, "the danger

66

of the jury's being unable to avoid using the hearsay declaration for its truth [is] so great that we would consider the jury unable to follow instruction from the judge not to consider the evidence for its truth." *United States v. Peaden*, 727 F.2d 1493, 1500 (11th Cir. 1984). In determining whether a limiting instruction would sufficiently ameliorate this danger, we consider, among other things, "the consequences of the jury's failure to follow the instruction," *id.* at 1501, and the extent to which the jury could easily understand and apply the instruction, *see Mateos*, 623 F.3d at 1365 (noting that the instruction "is a simple one that the jury could easily understand and take to heart"); Wright & Miller, Federal Practice and Procedure § 6718 (2020 ed.) ("To the degree the jury will be unable to follow the instruction, that inability is a factor supporting exclusion of the statement.").

The danger of unfair prejudice is greatest when the statements, if taken for the truth of the matter asserted, bear directly on the guilt or innocence of the defendant. *See United States v. Gomez*, 529 F.2d 412, 416–17 (5th Cir. 1976) (probative value of statements that "point[] directly to the suspects involved" should not be admitted because "the need for the evidence does not outweigh the possible improper prejudice"); *United States v. Rodriguez*, 524 F.2d 485, 487 (5th Cir. 1975) ("No instruction, regardless of its specificity or timeliness, could have precluded the jury from considering the informant's statements as some evidence that the defendant was in fact the owner of the seized marijuana."); *United States v.*

67

*Hernandez*, 441 F.2d 157, 164 (5th Cir. 1971) (distinguishing between statements that merely provide "background evidence" to explain officers' actions and statements that "point[] directly to the suspects involved").

Here, the danger of unfair prejudice carried by Deen's confession was enormous. The consequence of even one jury member taking Deen's confession for the truth asserted rather than for its effect on the listener would be Elysee's acquittal. Thus, Deen's confession belongs to the category of statements that presents the greatest danger of unfair prejudice—those statements that go directly to the issue of guilt and innocence. *See Hernandez*, 441 F.2d at 164. Furthermore, any limiting instruction the Court would give would likely be difficult to understand and apply. The reasoning the jury would have to follow to use the evidence for its instructed purpose would be attenuated, especially compared to the obviousness of the impermissible use. *Cf. Mateos*, 623 F.3d at 1365 (limiting instruction was sufficient because evidence "posed little threat of undue prejudice" and "[t]he concept expressed in the limiting instruction, that people should not be adjudged guilty based on their past or present relationships, is a simple one that the jury could easily understand and take to heart").

In addition to the risk of unfair prejudice, Deen's confession would almost certainly precipitate a trial within a trial on the adequacy of the Task Force investigation. In order to use Deen's confession to "undermine the credibility of

the officers, their investigation, and their ultimate conclusion that he was the culprit," defense counsel would—in our view—need to do more than simply elicit Deen's confession from Cabrera.  The District Court would need to conduct a lengthy trial within a trial to assess the Task Force's performance in the investigation, during which defense counsel would attack the conduct and credibility of Cabrera and others.  Here's how the subsidiary trial would likely play out.

During the defense's case in chief, defense counsel would request that Cabrera be declared a hostile witness, and the District Court would oblige. Defense counsel would then pepper Cabrera with leading questions about the investigation, *see* Fed. R. Evid. 611(c),[68] and Cabrera in response would repeat what Deen told him at the station, concede that he did not investigate whether Deen's confession was truthful, but deny that his failure to conduct any further investigation into the confession was inappropriate or unreasonable.

---

[68] Rule 611(c) provides:

> Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:
>
> > (1) on cross-examination; and
>
> > (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

69

Then, with Cabrera's credibility and conduct in question, the prosecutor would spend cross-examination rehabilitating Cabrera's investigative performance.[69]  The prosecutor would ask what Cabrera *did* do in response to Deen's confession, and Cabrera would (presumably) respond that he recognized the information Deen provided as exculpatory *Brady*[70] material, conveyed the information to the special agent in charge of the Task Force, and then followed her instructions on how to proceed.

To corroborate Cabrera's testimony regarding the disclosure of the *Brady* material, the prosecutor would likely call the special agent in charge as a rebuttal witness, and she would detail what transpired after she learned of Deen's confession. We assume that this would include testimony regarding any investigations conducted into Deen's criminal history, as well as a description of how the Task Force assessed the credibility of Deen's statement.  On cross-examination, defense counsel would—if possible—impugn the credibility of the special agent, and the prosecutor on redirect would introduce the results of the

---

[69] To the extent the prosecution's rehabilitation efforts would involve out-of-court statements, they would be admissible under *United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990), and *United States v. Jiminez*, 564 F.3d 1280 (11th Cir. 2009), discussed *supra* in part II.B.1.

[70] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1984 (1963).

70

background investigation into Deen and explain why it cast doubt on Deen's credibility.

But, as *Brady* material, the Deen confession also implicates the actions of the prosecutor. So, to convince the jury that the Government's case and the Task Force's investigation were conducted by the book, it is entirely possible that the prosecutor would seek to withdraw as counsel to testify (1) why he continued to prosecute Elysee, and not Deen, and (2) about the investigative work he did in preparation for cross-examination of Deen as a defense witness. There is no dispute in the record regarding the disclosure of the *Brady* material, so we assume that the prosecutor's testimony would also include discussion of when and how the Government disclosed Deen's confession to defense counsel.

To further drag out this subsidiary trial, it is entirely possible that one or both of the parties would seek to introduce expert witness testimony regarding, for example, proper police practices or the reliability of police identifications. *See* Fed. R. Evid. 702. Not only would this process require adversarial *Daubert*[71] briefing, but if the experts were ultimately admitted, their addition would force the jury to sit through hours of highly technical testimony on the proper protocols for

---

[71] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

running down leads, the reliability of eyewitness identification, and the procedures for verifying the veracity of confessions.

Plainly, a subsidiary trial to assess the Task Force's performance in response to Deen's confession would substantially—and unnecessarily—lengthen Elysee's trial by focusing the jury on the conduct of the Task Force, not Elysee's guilt or innocence. Or, put in the language of Rule 403, introduction of the Deen confession would present a substantial danger of "undue delay," "confusing the issues," and "wasting time." *See Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1318 (11th Cir. 2017) (district court did not abuse discretion by excluding evidence that "might have provoked the parties to engage in a time-consuming mini-trial" where the "concerns of prejudice and confusion substantially outweighed the probative value of the evidence"); *Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 935 (10th Cir. 1984) (district court "correctly observed that certain tenders of evidence . . . would constitute a mini-trial within a trial, resulting in undue delay, waste of time, and needless presentation of cumulative evidence"); *White v. United States*, 148 F.3d 787, 792 (7th Cir. 1998) ("We cannot say that the court was incorrect in viewing the probative value of this evidence as outweighed by the waste of time it would have caused. The issue . . . had the clear potential to develop into a trial within a trial.").

72

So, even if defense counsel were correct that Cabrera's performance in response to Deen's confession was properly an issue in this case, the confession would nevertheless be inadmissible under Rule 403. Put simply, the confession's probative value would be substantially outweighed by the danger (1) that the jury would use it impermissibly (resulting in Elysee's acquittal) and (2) that it would result in a lengthy subsidiary trial.

We therefore affirm the District Court's decision to preclude defense counsel from questioning Cabrera about Deen's confession for its "effect on the listener."

## III.

We turn now to Elysee's argument that his indictment was insufficient to charge a 18 U.S.C. § 922(g) offense under the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

## A.

Under 18 U.S.C. § 922(g)(1), it is "unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year [*i.e.*, a felony] . . . to . . . possess in or affecting commerce, any firearm or ammunition." Until recently, § 922(g) made possession of a firearm or ammunition unlawful when four elements were satisfied: (1) a status element, such as being a convicted felon; (2) a possession element; (3) a jurisdictional element,

*i.e.*, the interstate commerce element; and (4) a firearm element. *See Rehaif*, 139 S. Ct. at 2195–96.

Prior to *Rehaif*, everyone agreed that the "possession" element of § 922(g) required knowledge—the defendant must have possessed the firearm "knowingly." *Id.* at 2196. This knowledge requirement comes from 18 U.S.C. § 924(a)(2), which provides that "[w]hoever *knowingly* violates subsection . . . (g) . . . of section 922" shall be fined or imprisoned, or both. *Id.* (emphasis added).

Then, in June of 2019, the Supreme Court decided *Rehaif* and held that "knowingly" applies not only to the possession element, but also to the status element. *Id.* at 2200. In other words, to be convicted of violating § 922(g), a defendant must have known of his prohibited status—such as being a felon—at the time he possessed the firearm or ammunition at issue. *Id.*

Therefore, Elysee correctly asserts that his indictment and conviction are subject to attack under *Rehaif* because it did not charge—and therefore the Government did not prove (or even argue) at trial—that he knew of his status as a felon when he possessed the firearm at issue.

## B.

### 1.

Although we agree that Elysee's indictment was insufficient under *Rehaif*, we disagree with two other arguments he advances. First, he argues that his

74

indictment was jurisdictionally defective because it did not allege that he violated *both* § 922(g)(1) and 18 U.S.C. § 924(a)(2)—it only alleged that he violated § 922(g)(1). Second, for that same reason, he argues that we should not follow *United States v. Reed*, 941 F.3d 1018 (11th Cir. 2019), which held that we review these post-*Rehaif* claims only for plain error. *See id.* at 1020–21. While Elysee's appeal was pending, we rejected both of those arguments in *United States v. Moore*, 954 F.3d 1322 (11th Cir. 2020). *See id.* at 1337 (rejecting the argument that the court lacked jurisdiction because the indictment failed to track or cite § 924(a)(2) and applying plain error review). Therefore, following *Moore* and *Reed*, we review Elysee's challenge to his indictment for plain error. And, as in *Reed*, we find that Elysee's challenge fails on plain error review because he has not shown a reasonable likelihood that, but-for the error in his indictment, he would not have been found guilty at trial.

## 2.

On plain error review, the appellant must prove (1) that a plain error occurred and (2) that the plain error affected his substantial rights. *Reed*, 941 F.3d at 1021. A plain error affects an appellant's substantial rights if he can "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343

(2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 124 S. Ct. 2333, 2336 (2004)).

The error in Elysee's indictment clearly satisfies the first prong of the plain error test because the indictment did not charge—and therefore the Government was not required to prove at trial—that Elysee knew of his status as a felon when he possessed the firearm at issue. *See Reed*, 941 F.3d at 1021.

Turning to the second prong of the plain error test, we must decide whether Elysee has shown a reasonable probability that, but-for the error in his indictment, the outcome of his trial would have been different. In conducting our review, we examine the whole record, including proceedings that occurred before and after the claimed errors. *See Reed*, 941 F.3d at 1021.

In *Reed*, we faced a similar indictment error. We found that the defendant failed to show a reasonable probability of a different outcome at trial but-for the error in the indictment because he (1) stipulated that he had previously been convicted of a felony offense, (2) stipulated that he was not permitted to have a firearm or ammunition, (3) had been convicted of eight felonies and admitted at sentencing that he had served a minimum of 18 years in prison before his arrest for possessing the firearm, and (4) on cross-examination, admitted to knowing that he was not supposed to have the firearm at issue. *Reed*, 941 F.3d at 1021–22.

Here, like the defendant in *Reed*, Elysee stipulated to the fact that he had previously been convicted of a felony, and that he was not permitted to possess a firearm. Of course, under *Rehaif*, the Government must prove more than the mere fact of a felony conviction in order to establish that a defendant violated § 922(g)(1)—there must be additional evidence that proves that Elysee knew he was a felon as a result of that conviction. Otherwise, the post-*Rehaif* knowledge requirement would be indistinguishable from the pre-*Rehaif* mere-conviction requirement, and therefore *Rehaif* would have been meaningless.

Here, the additional evidence of Elysee's knowledge comes from his own statements, which imply that he knew he was a felon at the time he possessed the firearm. At trial, the Government introduced Segment 16:08 – 19:00 of the jail call in which Elysee and another person joked about how, prior to Elysee's arrest for illegally possessing the firearm in this case, he had bragged about never being caught by the police with a "hammer," which a Government witness testified is slang for a firearm. The only logical inference from this evidence is that Elysee knew that he was not supposed to have a firearm. Otherwise, he would have no reason to brag about never being "caught" by the police with one. And, just like in *Reed*, the jury easily could have inferred that he knew he was not supposed to have a firearm because he was a convicted felon.

Accordingly, based on Elysee's stipulation that he was a convicted felon and the jail call in which he bragged about never having been caught by the police with a firearm, there was ample evidence that Elysee knew he was a felon when he possessed the firearm at issue in this case. Therefore, Elysee has not shown a reasonable probability that, but-for the error in his indictment, the jury would not have found him guilty of violating § 922(g)(1), and his claim fails on plain error review.

IV.

Elysee next argues that the District Court abused its discretion in admitting into evidence one of his prior armed robbery convictions under Federal Rule of Evidence 404(b). Specifically, he argues that the District Court should have redacted all references to "armed robbery" or "deadly weapon" in the conviction, leaving only the information that it was a "firearm conviction." Appellant's Br. at 41. We disagree.

Evidence of a prior conviction is admissible under Rule 404(b) if it satisfies a three-part test: "1) [T]he evidence must be relevant to an issue other than the defendant's character; 2) sufficient evidence must be presented to allow a jury to find that the defendant committed the extrinsic act; and, 3) the probative value of the evidence must not be substantially outweighed by its undue prejudice." *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013). Elysee's challenge on

78

appeal relates only to the third part of this test, *i.e.*, whether the undue prejudice of

the evidence substantially outweighed its probative value. We review a district

court's Rule 404(b) evidentiary rulings for "a clear abuse of discretion." *United*

*States v. McNair*, 605 F.3d 1152, 1203 n.69 (11th Cir. 2010) (quoting *United*

*States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1208 (11th Cir. 2009)).

According to Elysee, the redacted version of the armed robbery conviction

would have been just as probative as the unredacted version for its relevant

purposes, but it would have been less prejudicial. Therefore, he argues, the District

Court abused its discretion by not redacting the conviction. We are unpersuaded

for two reasons.

First, the redacted version of Elysee's prior conviction was not equally as

probative for its relevant purpose as the unredacted version of the conviction.

Second, even assuming the two versions were equally probative, Elysee has not

shown that the District Court clearly abused its discretion by admitting the

unredacted conviction. We address these two points in turn.

A.

First, as a factual matter, we disagree that the redacted version of Elysee's

armed robbery conviction is equally as probative for its relevant purpose as the

unredacted version of the conviction.

79

The Government's theory was that Elysee was the passenger of the Optima and pointed a firearm at the occupants of another vehicle before ultimately fleeing from the police and discarding the firearm. The Government offered Elysee's prior conviction for armed robbery to show that he was familiar with how to carry a firearm and to negate any defense that he mistakenly believed the firearm was fake. The conviction also suggested that he knew how to illegally acquire a firearm because, at the time he committed the prior robbery, he was not permitted by law to purchase a firearm. The conviction, therefore, also supported the inference that he knew how to acquire a firearm through illegal means.

Admitting that Elysee had a previous "firearm conviction" would not have provided as much information about his familiarity with firearms as admitting his conviction for carrying a firearm in an armed robbery—it would not have, for example, demonstrated his familiarity with how a firearm feels when it is held and carried. Moreover, it would have suggested nothing regarding Elysee's knowledge of how to obtain a firearm illegally. Therefore, we reject Elysee's argument that the two versions of the conviction were equally probative.

## B.

Second, even if Elysee is correct that the redacted version of his conviction is equally as probative for its relevant purpose as the unredacted version of his

conviction, he has not shown that the District Court clearly abused its discretion by admitting the unredacted version of the conviction.

Elysee's approach—that we should compare the redacted and unredacted versions and decide whether it was an abuse of discretion not to redact the conviction—is not how we review Rule 404(b) rulings. Rather, our only concern is whether the prejudicial effect of the Rule 404(b) conviction, as it was allowed by the District Court (*i.e.*, unredacted), substantially outweighed the conviction's probative value. *See Sterling*, 738 F.3d at 238. And, here, the answer is no.

We note that Elysee's claim on appeal faces two tough obstacles. First, he must show that the prejudicial effect of the evidence *substantially outweighed* its probative value. Second, he must show that the District Court *clearly abused its discretion* when it decided that the prejudicial effect of the evidence *did not* substantially outweigh its probative value. Elysee has not made these showings.

The Government offered the conviction to prove Elysee's familiarity with firearms and his knowledge of how to acquire them illegally. The Government offered only one of Elysee's multiple prior armed robbery convictions to do so. The Government had legitimate reasons for establishing these points because it was required to prove that Elysee, as a convicted felon, knowingly possessed the firearm at issue.

81

On the prejudice side of the equation, the evidence was prejudicial because the jury might have convicted Elysee on the § 922(g) charge based on the belief that Elysee was generally dangerous to society. But this generic possibility of prejudice exists whenever Rule 404(b) evidence about a prior conviction is introduced, and the Court issued a limiting instruction to help alleviate some of this potential prejudice. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993). Therefore, although Elysee's prior conviction for armed robbery carried some danger of prejudicing the jury against him, he has not met the tough standard of showing that the prejudicial effect of the evidence *substantially outweighed* its probative value. And even if he had made such a showing, he has not shown that the District Court *clearly abused its discretion* by deciding the issue against him. In other words, while the Court's evidentiary ruling might not have been indisputably correct, Elysee has fallen well short of establishing that the Court clearly abused its discretion by admitting the unredacted conviction.

V.

We briefly dispose of Elysee's final argument, that his Florida armed robbery convictions were not "violent felonies" for the purposes of the Armed Career Criminal Act ("ACCA"). Since Elysee filed his appeal, the Supreme Court has squarely rejected his position. *See Stokeling v. United States*, 139 S. Ct. 544, 555 (2019) ("Robbery under Florida law . . . qualifies as a 'violent felony' under

82

ACCA's elements clause.").  Therefore, Elysee's sentence is not subject to attack on this ground.

VI.

For the reasons set forth above, Elysee's conviction is

**AFFIRMED**.

# Attachment

Entire Transcript of the March 8, 2018
Call Provided to the District Court
(DE 60:31-32)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 18-CR-20272-UNGARO

**UNITED STATES OF AMERICA**

**v.**

**DAVE ELYSEE,**

       **Defendant.**

                                 /

## TRANSCRIPT OF RECORDED CALL DATED MARCH 8, 2018

**Segment: [00:00 – 00:22]**

[Computer]: Press 1, this call may be monitored or recorded

[Computer]: Please enter your jail number at . . .

[Computer]: Please clearly speak your first and last name after the tone

[Caller]: Dave Elysee

[Computer]: Please enter your . . . thank you for using Global Tel-Link


**Segment: [8:00 – 13:24]**

[Dave Elysee]: I told him my side of the story, like man listen, I was, I was coming from a gas station, the gas station gonna have me on camera driving the vehicle, you feel me, I left the gas station . . . I got shot at. What's the first thing you do when you get shot at? I hit the gas, so bitch, I put him on one, ya feel me? I told him straight-up man, the police, the same police that kept me in prison and the same officers that basically joined the chase . . . and he aint even join the chase because he didn't hit his lights until we got way down the street so I ain't know that was the police, so I wasn't really running from him until I felt like I was in danger, when I seen him grabbing for his gun, because I did initially pull over, so I wasn't trying to like hide nothing. He like ok that's good that's a good thing, so he say basically like "man just just let me know talk to [unintelligible]

[Recipient]: Did he ever get out the car though?

[Dave Elysee]: yeah, all they ass got out . . . [unintelligible] . . . all they ass got out, ya remember when I had I had to roll all the windows down and I looked, I looked out the window?

[Recipient]: Yeah

2

[Dave Elysee]: and I was like, "what yall stop me for?" They was out the car with they hands on they pistols like yeah, they was walking up like they was finna come snatch us out the whip, that's why I say bruh [unintelligible] . . . ya feel me? Man they wasn't gonna shot me or do no crazy shit [unintelligible] . . . I don't care, none of that, I ain't finna die like this, I finna make it to the crib. So you know, [unintelligible] long story short, I was telling him that and he was like "ok, ok, this is the same officer?" And I was like "yes, I know his name and everything . . . Officer Ireland, it's the same nigga, I know its him because he was the main detective on the case" so he was like "ok, ok" I was like "and the new information I got to tell you is . . . that I wanna know if . . . ok, I got . . . basically you know . . . I don't wanna talk like that, but basically in other words"

[Recipient]: Yeah, I know what you saying bruh I know what you saying, yeah

[Dave Elysee]: Ya feel me? Da da da da da . . . he was like "ok that's great that's great, if you do that, if that's he said if that's what you telling me is accurate and you can do that before the 21st, before they even file charges . . . they can't file charges . . . it won't be no way to file because basically you coming in saying because he saying they gonna have to take a full statement of what of what you saying because they gonna make you put it on paper so aint no aint no way you could like "oh at the end" [unintelligible] "oh, I'm taking it back" this is what it is right here right? Boom. So you saying boom, boom, boom, then basically the charges they got on me gotta do, they gotta drop them because they aint even file charges yet, ya feel me? So its like you gotta . . . only thing he said still . . . you'll just have to talk to your probation officer I guess or whatever because I called today but I couldn't get in contact with her so I just left a message. He said that would be the only thing we worried about but that's nothing . . . he say that's a misdemeanor with a . . . um . . . with a probation violation but its not a violation because you haven't copped out to nothing. See, I aint know that, I aint know I'm not I aint violate probation yet, basically he saying the only reason why I'm in jail is because the crackers wrote whatever they wrote on this paper and the judge, the bond hearing judge, she looked at it and said "ok, this is enough to even this is just enough to hold him," so I'm still gonna get a bond but its gonna be a hold because probation. So he was like "you would have been out and everything ya feel me? But your probation so even when you do drop the gun charge you're still gonna have to face your division judge for probation" but he saying "trust me, I done got plenty people off before, ya feel me? It ain't gonna be nothing" and then I was like "ok, but what about my about my [unintelligible] I wanna be able to get him out, I don't want him sitting in there, ya feel me? I want him out so he could be able to do what he got to do from the outside. We aint trying to both of us . . . no . . . I need him out. I need you to guarantee me that he can get out." He was like "so long as he got no charges no none of that, you already know its out, they gonna give him a bond." I say "and he will be out the same day," he said "the same day," I said "ok, listen sir, I'm giving you this information because you're my lawyer, this is between us two confidential, client confidential, and this our record, I don't want this coming back up to nothing like, ya feel me? You my lawyer, you represent . . ."

[Recipient]: Man why you . . . [unintelligible]

[Dave Elysee]: That's why I didn't tell him too much I aint I aint he was like he was like "Man," but he, I could though, he with me, because he was like "You know what? With this little information you gave me, that's just enough, I don't want to even know no names, I don't want to

3

know nothing, when you for sure its what you wanna do . . . than, ya feel me, we'll . . ." I was like "ok . . . sound like . . . ya feel me" and I asked him, I say "do you think I should get a lawyer?" He said "with [unintelligible], you're not going to need a lawyer from what you telling me" so he say from what I'm telling him, I won't even need a lawyer for the uhh the probation shit. So basically, the that lawyer I get, I'll just throw it on you, ya feel me? With um, while you out on bond or whatever, ya feel me? But I told him "I still we aint still ain't come to a conclusion with that, [unintelligible] you know I aint really trying to holla at his ass too long on the phone . . ." I was just like "alright sir, thank you for the information you gave me da da da, thank you for taking time out of the . . . basically briefing me about this because I've never been in this situation where I had to uh probation and shit like that, because I was sixteen when I went to jail or whatever really only on probation because it was part of my sentence, if I knew what I was doing, if I knew what I knew then I wouldn't have even took that shit, I would have spent the whole time in prison and been outside free. He was like "yeah, you're not saying nothing wrong, da da da" I was like "alright sir, thank you for the information or whatever," I banged on him or whatever. I was like alright ok that why I aint know when to speak, I was asking him like damn, kinda like made me feel a little better, like ok ya feel me? I I I got a chance

[Recipient]: [unintelligible]

[Dave Elysee]: That's why I say man shit, I'm gonna talk to his ass tomorrow, not tomorrow, ummm . . .

## Segment [14:41 – 15:04]

[Dave Elysee]: I say "whats the procedures of that?" Cause I thought you had to go to like the state attorney's, he's like "Nah, you can go to any police station and just tell them the date it occurred," what it was? March 4th? And they gonna have the case number in the computer and everything whatever whatever with a sworn statement and that will be that.

[Recipient]: [unintelligible]

## Segment [15:20 – 15:42]

[Dave Elysee]: You know my old girl told me not to go out that night bruh?

[Recipient]: [unintelligible]

[Dave Elysee]: but shit we was already committed, we had bought the [unintelligible], I aint finna not go out when I know bruh wanna go out, ya feel me?

[Recipient]: [unintelligible]

[Dave Elysee]: Hell yeah, and then me, I coulda just put that in my car but I know him, he like "well I don't really go out like that . . ." shit . . . bruh done brought his shit and he done spent a

4

little check so we gonna go out and have a good time, ya feel me? I about to pay for everything, bottles, everything . . .

**Segment [16:08 – 19:00]**

[Dave Elysee]: Shit man, this shit crazy, nigga trying to go have a good time . . . get fucked up dog and I told [unintelligible], I said "bruh, who the fuck was in that black mustang bruh?" They the reason why a nigga locked up right now . . . nigga wasn't even supposed to be worrying about nothing bruh

[Recipient]: Yeah yeah that's what, if they never would have never gotten behind a nigga like that

[Dave Elysee]: Playing with a nigga bruh

[Recipient]: Regular regular speed and shit ya feel me?

[Dave Elysee]: Shit, speeding fast [unintelligible]

[Recipient]: they was like right on [unintelligible] ass [unintelligible]

[Dave Elysee]: The fuck, I ain't gonna lie man, I'm like, I'm finna drop this shit. Shit, hos, its two females in the car, I'm like "what the fuck dog?"

[Recipient]: God damn boy . . .

[Dave Elysee]: and then a nigga aint even really know what they was getting pulled for so a nigga aint even wasn't thinking like . . . oh that's

[Recipient]: Yeah, we aint even know that . . . [unintelligible] . . . and then all that shit was coming together like . . . damn, that's why [unintelligible]

[Dave Elysee]: Bruh, you know we had pulled right next to they ass in the field, that was them in the truck

[Recipient]: Noooo

[Dave Elysee]: It had to be them bruh, that truck right there bruh, when we had left and went back to the store and came back

[Recipient]: Yeah, yeah, yeah

[Dave Elysee]: Yeah, that was them, that was the same truck, you think about it bruh, that was the same gray truck that was trying to run me over in the field by my crib

[Recipient]: Hey bruh, I would bruh [unintelligible] that shit was crazy

[Dave Elysee]: That shit was scary, I ain't gonna lie, I thought it was gonna kill a nigga fool, I aint never been in no shit like that, that whole shit had me tripping, I aint never [unintelligible]

[Recipient]: Hey, I (laughs), boy them crackers was hot boy, man

5

[Dave Elysee]:  Then the cop get in the back seat like "Oh, you ain't gonna tell me nothing, you ain't gonna tell me nothing?"  Questioning a nigga like damn, what you want me to tell you, I ain't got nothing on me, what you want me to lie on myself?  What the fuck.

[Recipient]: Hey, you remember that same day bruh?  We was talking about uh how we aint never get caught with a hammer?

[Dave Elysee]:  Truly bruh (laughs)

[Recipient]: That's crazy bruh (laughs).   That's crazy bruh, that same day we talked about that shit.

[Dave Elysee]:  And I'm always saying that . . . its like I talked that shit up on myself.  I always pride myself like yo boy I aint boy it ain't nothing boy . . . them crackers ain't getting me like that. Just if, only if a nigga was on feet, that car light, that shit be trappin a nigga, a nigga gotta get away first and then jump out and run, it be trappin a nigga, then the nigga crash, I thought it was over with then . . . airbags done popped out, hit the pole, I ain't never hit no pole or seen or actually when bitch hit the pole, that shit came out the ground

[Recipient]: (Laughs) that bitch came out the ground man, that bitch, that's crazy


**Segment [22:57 – 23:08]**

[Dave Elysee]: I can't get in nobody mind, like ya feel me?  I ain't trying to get into nobody, I ain't trying to fineese nobody, man I'm trying, I'm being truthful to everybody but the police


**Segment [28:28 – 30:20]**

[Dave Elysee]: You know a nigga had sparked that shit over there . . . um . . . Gateway, that Friday

[Recipient]: Yeah?

[Dave Elysee]: Hell yeah, I went round there, see what them niggas be about, came out there [unintelligible] and shit.  I tried to catch [unintelligible], nah the nigga the nigga, some some nigga got [unintelligible] I don't know who he is though, but I was trying to get Vaughn so I'm locked in on him.  But we, we in a bang out.  He hitting, I'm hitting back, he had the stick, he hitting back.

[Recipient]: [unintelligible]

[Dave Elysee]:  He had done dropped to the ground, I was dumping (sound effects) . . . he . . . (sound effects).  I done got behind a tree, I hear them hitting (sound effects).  Real deal bang out, like out of all them niggas he the only one stood toe to toe with me, like three niggas all yall got guns, only one of me – I got 18 shots, lets do it.  Them niggas running, I see the nigga run off, I'm clapping at them (sound effects), I'm trying to knock his, knocking his fucking head off, but the tree right there so I can't really come from behind, I can't come from behind the tree because then Vaughn gonna hit me, ya feel me?  And they don't really see where I'm shooting, they just they

6

just hear the shots coming from through the cut, they don't know really like who's hitting, like they don't know who till this day, them niggas don't know who, they just know they was in that cut hitting, ya feel me?

[Recipient]: Was you on feet?

[Dave Elysee]: Ya, I had to jump out, park the whip, ya feel me? I aint give a little [unintelligible] or whatever and I was good, when I went back through [unintelligible] I ain't, I still hear them niggas shooting but shit wasn't no where near where I was, I know they wasn't hitting at me no more, they was just shooting through the cut now, I'm gone, before the police come, ya feel me? And I know Gateway got a commons and shit, so I couldn't go through the front, I had to come through the back, that's where he be at right there anyways, I told [unintelligible] and them boys, that's where them niggas be at, so I just caught them niggas right there

[Computer]: You have 60 seconds remaining

7